937 A.2d 334 (2008)
397 N.J. Super. 335
POND RUN WATERSHED ASSOCIATION, an unincorporated group of Hamilton Township residents, Ames Hoyt, principal officer, and Ames Hoyt, Individually; David Ardente, Albert and Cindy Britton, James Canterbury, Carl D. Markau and Mary Ann Rieger, Plaintiffs-Appellants,
v.
TOWNSHIP OF HAMILTON ZONING BOARD OF ADJUSTMENT and Crestwood Construction, LLC, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued November 26, 2007.
Decided January 10, 2008.
*336 R. William Potter Princeton, argued the cause for appellants (Potter and Dickson, attorneys; Mr. Potter and Peter D. Dickson, on the brief).
John H. Dumont, Princeton, argued the cause for respondent Township of Hamilton Zoning Board of Adjustment (Dumont & Watson, attorneys; Mr. Dumont, on the brief).
Daniel J. Graziano, Jr., argued the cause for respondent Crestwood Construction, LLC (Daniel J. Graziano & Associates, P.C., attorneys; Mr. Graziano and Sahbra Smook Jacobs, on the brief).
Before Judges LINTNER, SABATINO and ALVAREZ.
The opinion of the court was delivered by
SABATINO, J.A.D.
Plaintiffs, several residents of Hamilton Township ("the Township") and a watershed preservation advocacy group, seek to invalidate numerous use and bulk variances the Township's Zoning Board of Adjustment ("the Board") granted to a developer, Crestwood Construction, LLC ("Crestwood" or "the developer"). The variances authorized Crestwood to build on a 10.9-acre site a mixed-use project, consisting of four buildings with a total of 119 age-restricted apartments, two retail/office buildings, and another building with a 168-seat restaurant. The variances were necessary because the site is located in a research and development zone ("RD zone") that prohibits residential housing and that disallows retail businesses and restaurants except on lots with at least one hundred acres.
The Law Division rejected plaintiffs' challenge to the project in most respects, except that it found that the developer had improperly agreed, as a condition of its variances, to pay a $476,000 subsidy to the *337 Township for the off-site construction of a proposed amphitheatre in a nearby municipal park. Ruling that the $476,000 illegal exaction was only a minor part of the project, the trial court excised that condition and did not require any further public hearings before the Board. Plaintiffs now appeal the trial court's decision on multiple grounds.
Although many of plaintiffs' arguments lack merit, we are persuaded that the variances are flawed in two significant respects. First, the notice of its zoning application that Crestwood published in the newspaper and served upon nearby property-owners was substantively deficient under Perlmart of Lacey, Inc. v. Lacey Twp. Planning Bd., 295 N.J.Super. 234, 241, 684 A.2d 1005 (App.Div.1996). In accordance with Perlmart, the notice should have specifically alerted neighbors and the public at large that the variances Crestwood sought included approval for a large restaurant with a potential liquor license, going beyond the notice's vague reference that the project included "retail/office units." Second, the developer's bargained-for $476,000 contribution towards an off-site Township recreational facility was a significant, not a minor, part of the development proposal, substantially intended to compensate for the project's complete lack of on-site recreational facilities for the senior citizens who would be living there. Consequently, the matter preferably should have been remanded to the Board for further public consideration after the trial court correctly deemed the developer's negotiated payment an illegal exaction.
Because the project is already partially built, we decline to fashion a comprehensive remedy to address these deficiencies, except that we enjoin further construction of the restaurant at this time pending proper notice to the public of the restaurant proposal and the Board's renewed consideration. We remand the matter to the Law Division for the fuller development of an up-to-date factual record germane to remedial issues, and to clarify the scope of the issues that must be reheard before the Board. After those facts are adduced, the trial court shall exercise its sound discretion to formulate a solution that duly considers the interests of the litigants, affected third parties such as contractors, vendors, and prospective tenants, and the public at large.

I.
The project at issue, known in marketing materials as "Twin Ponds," involves a 10.9-acre L-shaped parcel of land on the east side of Yardville-Hamilton Square Road in Hamilton Township. The property is designated as Section (or Block) 2173, Lots 18, 19, 20 and 21 on the Township's tax maps. The property was formerly used as farmland. At the time of Crestwood's zoning application, the property was vacant and owned by the Diocese of Trenton. The developer, Crestwood, subsequently purchased the property and planned to continue to own it after the project was built.
In its application submitted to the Board in January 2005, Crestwood proposed a "mixed-use active adult community and commercial development" on what is an RD zone. Of the 17,000 square feet proposed as commercial space, a sit-down restaurant would cover 5,000 square feet and the remaining 12,000 square feet would be "dedicated to an even split of office and retail use."
The site would also include four two-story buildings with "age qualified" garden apartments for residents fifty-five and older. Each building would have thirty-two bedroom units. Each apartment would have two parking spaces as required by the local ordinance. The woods in the far *338 eastern portion of the property were to be preserved.
The "boulevard type entrance" for the project would line up directly with Briarwood Drive, a residential subdivision across the street, and would have a landscaped island. The development would be called Twin Ponds because of two artificial ponds to be created on each side of the entrance driveway. The ponds were an aesthetic consideration and would provide only minimal storm water management. The Township's engineers, land use coordinators and other consultants reviewed and commented on Crestwood's application before the Board considered it.
Crestwood applied for two use variances, pursuant to N.J.S.A. 40:55D-70(d), for relief from the use restrictions in the RD zone. One use variance was required because the proposed residential use for the apartments is not permitted in the RD zone. The second use variance was needed because the proposed commercial uses for the 10.9-acre site did not meet the criteria for this size project. By Township ordinance, mixed use developments in the RD zones containing retail uses are permitted only if the minimum total area to be developed is one hundred acres. Hamilton Twp., N.J., Land Dev.Code § 160-80(1)(b)(7)(i) (1979).
At its appearance before the Board, Crestwood also sought preliminary site plan approval of the entire project and final site plan approval of "phase one," consisting of sixty units in the southern residential village. Phase two included the commercial section, and phase three included the other sixty units of garden apartments.
The application sought bulk variances for "front, side, and rear yard setbacks, the distance between the two principal buildings, parking area setbacks from any lot line, [the] minimum buffer area along any common property line in the residential districts, and [a] ground sign setback from the property line." This last variance was sought for a ground-mounted, thirty-square-foot sign to be placed ten feet from the right-of-way. The plan complied with other RD zone requirements, such as building height and maximum impervious surface coverage.
The application also sought several design waivers. One was for a commercial area loading berth, with deliveries to be made during off hours so that truck parking would not conflict with the users of the commercial parking lot. Another design waiver was for the size of the garden apartments. The third design waiver sought was in connection with the distance between the ground level openings on each apartment building.
According to the project's architect, the apartment buildings were designed to have "no front or back. . . . So, basically, all the way around the apartment it always looks like a front elevation." The apartment buildings were to be connected by a shared vestibule. The residents would have access to the secure lobby level from all parking areas. Each of the two-bedroom residential units would be approximately the same size, 45 by 24 feet, totalling 1100 square feet.
The commercial portion of the project included three sixty-foot deep, one-story buildings with decorative dormers or cupolas. The HVAC systems would be either "wall type units" or outside condensers "that could be easily landscaped and screened."
The plan proposed that fifty-one percent of the total area would be impervious cover, which is less than the fifty-five percent maximum limit for RD zones. The plan also satisfied the ordinance's five percent landscaping requirement in parking *339 areas and the ordinance's technical criteria for landscaping. Further buffers would be added along the property lines and the pondscape plan would be supplemented with additional plantings.
The plan also included widening Yardville-Hamilton Square Road to sixty-four feet, pursuant to the Township engineer's requirements. The right-of-way dedication would be increased to ten feet. In accordance with comments from the Township's experts, Crestwood agreed, to the extent possible, to minimize the crossings at Yardville-Hamilton Square Road. It also sought to eliminate one of the storm sewers and shift one of the water crossings out of the intersection.
On April 2, 2005, Crestwood mailed notices of the hearing on its application to the listed owners of property located within two hundred feet of the project site. On that same date, a public notice of the application was also printed in a local newspaper. As we will explore at length in Part II of this opinion, the notice incorrectly listed the property's Block number as "2713" rather than "2173." The notice made no mention of the 168-seat restaurant contemplated for the site. The notice indicated that a public hearing on the application would be conducted before the Board at its next regular meeting on April 12, 2005.
For reasons not clear from the record, Crestwood's application was not listed on the Board's tentative agenda for the April 12 meeting. A partial transcript from that meeting indicates that the application was carried to the next regular board meeting on May 10, 2005. The Board's tentative agenda for the May 10 meeting does include the Crestwood application. During that May 10 meeting, Crestwood's application was "tentatively carried" to a "special meeting" on May 24, 2005. A public notice of the adjournment to May 24 was subsequently published in The Trenton Times.
As anticipated, the application was listed on the tentative agenda for the May 24 meeting, and was considered on its merits at that time. Crestwood presented testimony in support of its application by several experts. These experts included a licensed planner, an architect, an engineer who prepared a stormwater management plan, and another engineer who testified on traffic issues. The developer also presented testimony from the prospective owner of the on-site restaurant.
Apart from the developer's witnesses, the Board also heard testimony from its own planner, who recommended approval of the project upon the adoption of several conditions. The Board also heard a statement in support of the project from a representative of the Township's administration. The representative commented in particular about the negotiated arrangement for Crestwood to contribute $476,000 to the Township in off-site improvements, a feature that we shall discuss in more detail in Part III of this opinion.
No members of the public appeared at the May 24 meeting in opposition to the development. The only member of the public who addressed the Board concerning the project was the nephew of a nearby property-owner, who told the Board that his aunt intended to sell her own land in the future and desired to have the entire area re-zoned to avoid the need for a similar variance. Because there were no objectors at the meeting, the Board did not hear any competing expert testimony, and the developer's witnesses were not questioned by any opposing counsel.
After testimony concluded, the Board members voted seven to zero to approve the application, issuing preliminary site plan approval for the entire site and final site plan approval for phase one. On June *340 14, 2005, the Board adopted a resolution memorializing its actions granting use and bulk variances, as well as the preliminary and final site plan approval. On June 22, 2005, a public notice was published, reflecting that the confirming resolution had been adopted by the Board.
In its resolution, the Board summarized Crestwood's application and made the following findings of fact:
1. The Applicant has submitted proof of notice and proof of publication and the Zoning Board has jurisdiction to hear this matter.
2. Diocese is the owner of property located at Yardville-Hamilton Square Road in the Township of Hamilton, Map 213, Section 2173, Lots 18-21, Zone RD.
3. The Hamilton Township Zoning Ordinance permits mixed use development (Section 160-80) in the RD Zone but on larger tracts of land.
4. Applicant's proposed site is in an area of mixed use development already.
5. Applicant testified [that] affordable housing meeting COAH standards would be part of its residential development.
6. The use variances and bulk variances would allow the project to be developed appropriately for mixed uses without detriment to the Master Plan or Zone Plan.
7. Considerable beneficial interest can be found in approving Applicant's use. The location of the use adds flexibility to the zone, encourages age restricted housing, provides quality ratables and will generate less school and traffic impacts.
8. The zoning purposes of the Township can be found to be advanced by development of the site as proposed.
The resolution then recited that the Board granted the application, subject to numerous conditions, including: lot consolidation; approvals from county entities; submittal of revised site plans; compliance with certain lighting, landscaping, signage and sidewalk specifications; a ban on twenty-four-hour commercial uses; and the $4,000 per-residential unit payment for recreation improvements to Veterans Park.
On August 5, 2005, plaintiffs filed a complaint in lieu of prerogative writs in the Law Division challenging the Board's approval of the Crestwood application. The complaint alleged, among other things, that: (1) the public notice for the project was deficient; (2) the grant of a use variance was improper "rezoning by variance"; (3) the application included an "unlawful exaction," or an "illegal quid pro quo," in requiring Crestwood to pay $4,000 per residential unit to the Township for "unspecified `improvements to Veterans Park' and including the `development of an amphitheater in the park'"; (4) inadequate information was provided to the public at the time of memorialization; and (5) the stormwater management plan devised by Crestwood was "materially defective." The named defendants, Crestwood and the Board, denied these contentions, and moved for summary judgment.
After hearing oral argument, the trial court issued a written opinion on September 11, 2006. The court sustained the Board's resolution in all respects, except condition number seventeen, the $4,000 per-residential unit payment to the Township. The court excised that condition from the resolution.
This appeal ensued. On appeal, plaintiffs essentially reiterate the contentions they made before the trial court concerning inadequate notice, and the alleged procedural and substantive deficiencies in Crestwood's application. Plaintiffs also contend that the trial court should not have excised the improper $476,000 contribution, *341 but rather should have invalidated the approvals in their entirety.

II.
We first address the sufficiency of the public notice that Crestwood provided concerning its application to the Board. On April 2, 2005, Crestwood placed the following notice in The Trenton Times, a daily newspaper:
 OWNER/APPLICANT
 Crestwood Construction, LLC
 APPLICATION NO. 05-02-011
 DATE March 31, 2005
PUBLIC NOTICE
PLEASE TAKE NOTICE that on the 12th day of April 2005, at the Township of Hamilton Municipal Building, 2nd Floor, Council Chambers, 2090 Greenwood Avenue, Hamilton Township, New Jersey, the Zoning Board will hold a hearing on the application of the undersigned, at which time and place interested persons will be given an opportunity to be heard. Said meeting will take place at 7:00 P.M.
The location of the premises in question is located in the RD zoning district, Map 213, section 2713, lots 18-21, and more commonly known as Yardville-Hamilton Square Road. The applicant is seeking a use variance for two non-permitted uses in this zoneage-restricted rental units and retail/office units, for two separate uses on one property, together with bulk variances for front and side yard setbacks, total of two sides and rear yard setbacks, sign setback; variance for separation distance between buildings, variance for buffer distances, approval for preliminary site plan for the purpose of constructing a mixed use development; approval for final site plan for Phase I; and such other relief as the Board deems necessary. A copy of said application is on file at the Township of Hamilton Municipal Building in the office of the Land Use Coordinator and may be inspected during office hours by all interested parties prior to said meeting.
Crestwood, through its counsel, also mailed an identical notice to sixteen property owners shown on the Township's tax records as owning lots or easements within two hundred feet of the subject property. Four of those nearby property owners are among the plaintiffs in this litigation.[1]
As we have already noted, the April 2 public notice contains a typographical error, referring to the subject property being in Section (or Block) "2713" rather than Section "2173." The error is contained in both the notice published in the newspaper as well as in the certified letters sent to the nearby owners. However, Crestwood's development application on file in the Township reflected the correct "2173" Section number.[2] Additionally, the Board's May 24 agenda also listed the correct Section number for the property.
Plaintiffs argue that the typographical error in the original public notices for the application is a fatal defect, requiring the Board's action on the Crestwood application *342 to be nullified. Plaintiffs note that "2713" Yardville-Hamilton Square Road is vacant land located over a mile from the actual site. They maintain that the notice's mistake as to the Section number was material, and had the potential to lull neighbors into believing that the proposed development was more than a mile from their homes. According to plaintiffs, the error was compounded by the absence of any indication in the notice listing the Diocese of Trenton as the then-current owner of the property. The error was further compounded, they assert, by Crestwood's failure to mail them individual follow-up notices after the matter was not reached by the Board on either the initially advertised date of April 12 or at the Board's next regular meeting of May 10. Plaintiffs also claim that the application's status became further confused by its absence from the April 12 Board agenda, and the terse oral reference to its postponement at the end of the April 12 meeting.[3]
Defendants maintain that the error in the section number in Crestwood's original public notice was nothing more than a minor clerical glitch. They point out that tax map 213, which was correctly identified in the notice, clearly shows the property at issue as being located directly across from the Briarwood subdivision on Yardville-Hamilton Square Road and not over a mile away. The application accurately describes the parcel as the Diocese's property on Yardville-Hamilton Square Road. The developer had posted a sign on the property while its application before the Board was pending. Further, the Township's land use coordinator submitted to the trial court a certification attesting that he had received several inquiries from neighbors regarding the application while it was pending, and that the persons he spoke with either knew the correct location before they called him or had him describe the location to them.
The trial court concluded that, under the circumstances, the typographical error in the notice was inconsequential. We agree.
N.J.S.A. 40:55D-11 requires that public notices for a proposed variance include, among other information, "an identification of the property proposed for development by street address, if any, or by reference to lot and block numbers as shown on the current tax duplicate in the municipal tax assessor's office . . . [.]" Ibid. We concur with the trial court that, despite the clerical error, Crestwood's notice reasonably complied with this requirement for "an identification of the property." Ibid. The inclusion of the block and lot designations are not even mandatory in all instances, as the statute permits the applicant to include simply a street address. Ibid. We are mindful that in this case the subject property, as a vacant lot, did not have a numerical street address. However, the cross-reference to tax map 213 sufficed to alert someone reading the notice of the site's correct location. The notices were properly mailed, as required by the statute, to all property owners within two hundred feet. See N.J.S.A. 40:55D-12(b). A reasonable person receiving such a notice in the mail would not expect that the property would be situated over a mile away. Taking these considerations as a whole, we sustain the trial court's finding that the typographical error in this case did not vitiate the legal sufficiency of the notice.
We also concur with the trial court's rejection of plaintiffs' claim that Crestwood was obligated to mail them new individual notices advising that its application *343 had been adjourned to a May 24 special meeting before the Board. As the trial court correctly observed, "[t]here is no . . . provision in the [statute] requiring additional certified notices if an application is carried to another meeting. The [statute] only requires initial notice." Here, the Board's chairman announced on the record the adjournment of the hearing to a future date. That suffices under the Municipal Land Use Law ("MLUL"), N.J.S.A. 40:55D-11. See Kramer v. Bd. of Adj. of Sea Girt, 45 N.J. 268, 276-77, 212 A.2d 153 (1975); see also Cox, New Jersey Zoning and Land Use Administration, § 27-1.5 (2007).
We also concur with the trial court's pragmatic observation that, given the common practice of zoning boards to consider complex variance applications over multiple meetings, "[i]t is unreasonable to conclude that new [individual] notice is required when a hearing is continued." Interested neighbors or members of the public have an obligation to attend the first meeting, or otherwise stay reasonably abreast of the status of the application, where, as here, adjournments are orally announced on the record at Board meetings and thereafter confirmed in advertised public notices.
As an entirely separate ground for reversal, plaintiffs contend that the public notice of Crestwood's variance application was substantively deficient under Perlmart, supra, 295 N.J.Super. at 241, 684 A.2d 1005, in failing to alert recipients sufficiently to the "nature of the matters to be considered" at the variance hearing. N.J.S.A. 40:55D-11. In particular, plaintiffs argue that the notice here violated Perlmart and the MLUL because it failed to disclose that (1) the development would include a "potentially controversial" restaurant, one that would be seeking a liquor license; (2) the project would include no on-site recreational facilities; (3) the project's stormwater management system was allegedly undersized; (4) no landscape buffers would be erected; and (5) the project would require the widening of Yardville-Hamilton Square Road.
In its written decision, the trial court did not explicitly address these contentions, nor did it cite to Perlmart. The trial court did observe that defendants had "made good faith efforts [in the notices] to describe the type of relief sought in the land-use application," and that the notices sufficiently "described each variance requested by Crestwood." Plaintiffs contend that this is not so.
We begin our own analysis of these contentions with a recognition that proper public notice in accordance with the requirements of the MLUL is a jurisdictional prerequisite for a zoning board's exercise of its authority. Perlmart, supra, 295 N.J.Super. at 237, 684 A.2d 1005. A board's decision regarding a question of law, such as whether it has jurisdiction over a matter, is subject to de novo review by the courts and thus is afforded no deference. TWC Realty P'ship v. Zoning Bd. of Adj. of Twp. of Edison, 315 N.J.Super. 205, 211, 717 A.2d 439 (Law Div.1998), aff'd, 321 N.J.Super. 216, 728 A.2d 338 (App.Div.1999).
N.J.S.A. 40:55D-11 specifically requires that public notices of applications before a zoning board must state, among other things, "the nature of the matters to be considered." We interpreted this descriptive requirement of the statute in Perlmart, supra. There, a developer had sought approvals from a planning board for a major site plan, minor subdivision and associated use and bulk variances for a planned shopping center. Perlmart, supra, 295 N.J.Super. at 237, 684 A.2d 1005. The public notice issued by the developer *344 in Perlmart accurately set forth the date, time and place of the board hearing, identified the street address of the property, and advised when and where members of the public might have access to the application. Ibid. However, the notice provided no clue that the anticipated project was for a conditional use shopping center. Id. at 241, 684 A.2d 1005. Instead, the notice had merely stated in this regard that "`[t]he minor subdivision will result in the creation of [three] commercial lots with a total of 42.53 acres.'" Id. at 237, 684 A.2d 1005.
We held in Perlmart that the developer's notice was defective and failed to comply with the MLUL's mandate in N.J.S.A. 40:55D-11 requiring notice of the "nature of the matters to be considered" by the board. Id. at 241, 684 A.2d 1005. In construing that statutory requirement, we observed that:
It is . . . plain that the purpose for notifying the public of the "nature of the matters to be considered" is to ensure that members of the general public who may be affected by the nature and character of the proposed development are fairly apprised thereof so that they may make an informed determination as to whether they should participate in the hearing or, at the least, look more closely at the plans and other documents on file.
[Id. at 237-38, 684 A.2d 1005 (quoting N.J.S.A. 40:55D-11) (emphasis added).]
We reached that conclusion after consulting a variety of analogous cases from other jurisdictions[4] condemning terse public notices that failed to achieve those aims.
As part of our analysis in Perlmart, we observed that "the critical element of such notice has consistently been found to be an accurate description of what the property will be used for under the application." Id. at 238, 684 A.2d 1005. In particular, we read the statute to require a "common sense description of the nature of the application, such that the ordinary layperson could understand its potential impact upon him or her." Id. at 239, 684 A.2d 1005. On this score, we endorsed the view of a zoning expert cited by the Pennsylvania court in Appeal of Booz, supra, 533 A.2d at 1098-99, observing that "`[p]eople turn out at a zoning hearing to oppose `a gasoline station' or a given sign or structure. Few laymen have any idea of the difference between a variance and [other technical zoning terms.]'" Perlmart, supra, 295 N.J.Super. at 239, 684 A.2d 1005 (emphasis deleted; citations omitted).
Consequently, we adopted an approach in Perlmart that places "`emphasis on the importance of [the public notice] accurately identifying the type of use or activity proposed by the [land use] applicant in laymen's terms, rather than the technical zoning term for that use . . . [.]'" Ibid. (quoting Appeal of Booz, 533 A.2d at 1099) (emphasis deleted). We instructed that "[w]ithout that basic information, we are not assured that the general public understood the nature of the application . . . [.]" Id. at 239-40, 684 A.2d 1005.
Applying these general principles to the facts in Perlmart, we concluded that the developer's notice there, which had merely alluded to three "commercial" lots being created, did not reasonably alert neighbors and the public that a conditional use shopping center with a K-Mart department store was contemplated for the site. Id. at 241, 684 A.2d 1005. Accordingly, we found *345 that the planning board lacked jurisdiction to consider the application. Ibid.
Similarly, in the present case, Crestwood's public notice was deficient in failing to indicate whatsoever that the proposed development included plans for a large sit-down restaurant, one that was expected to seek a liquor license to serve alcohol to its patrons. The notice merely refers to "retail/office" uses. That generic reference would not reasonably put a neighbor, or an interested resident, on notice that a substantial restaurant was contemplated for the site. Indeed, Crestwood's plans on file reflected that the 12,000 square feet of retail and office uses would be situated in two other structures, Buildings "A" and "B," and that the 5,000 square foot restaurant would be located in a separate edifice, Building "C," with a gazebo.
Contrary to Crestwood's present assertion set forth in its post-argument supplemental brief, the Township's ordinance for the "RD" zone plainly requires a variance for a restaurant in this mixed-use context involving a parcel less than one hundred acres. The RD zone does not include retail uses as a permitted use for lots under one hundred acres. See Hamilton Twp., N.J., Land Dev.Code § 160-80(1). The RD zone does allow "[r]estaurants or cafeterias located within a principal building" as an accessory use. Id. at § 160-80(2)(e). However, the zoning code specifically defines a "principal building" as "[a] building in which is conducted the main or principal use of the lot on which said building is situated." Id. at § 160-7 (definitional section).
It is manifest that the free-standing building in which the 5,000 square foot restaurant is to be housed on the subject parcel is not "the main or principal use of the lot." The main use of the site consists of the four age-restricted apartment buildings containing 119 units. Even if we instead deemed the retail or office uses on site as the project's "main" features, the record is barren of any proof that the contemplated restaurant was going to be an accessory use inside of what principally would be a retail building or an office building. To the contrary, the plans call for the restaurant to have its own separate structure, Building C.[5]
Although no member of the public appeared at the May 24 hearing to object to the proposed restaurant, the restaurant drew a substantial amount of attention in the applicant's exhibits, in the testimony of the witnesses, and in questions from the Board. The restaurant is expected to be open seven days a week, serving lunch and dinner daily until ten or eleven p.m. It is allotted 56 of the 110 on-site commercial parking spaces in the developer's plans. Crestwood's traffic expert specifically classified the restaurant, for trip generation purposes, as "a high-turnover restaurant." The Board considered testimony about the restaurant's parking needs, and their interplay with the parking needs of the other uses on site. The Board members also expressed concerns about the size of trucks that vendors would use to make *346 deliveries to the restaurant, and about the possibility that large tractor-trailers might be coming and going to the property. Although no contract had yet been signed, the restaurant's anticipated owner, who presently operates a restaurant with a liquor license in Trenton, appeared at the hearing and fielded several questions from Board members.
In sum, it is readily apparent that this 168-seat, 5,000 square foot restaurant is a component of this development that would be of heightened concern to neighbors and other members of the public, particularly as to issues of traffic, parking, noise and the possible consumption of alcoholic beverages on site.[6] It was therefore insufficient, under N.J.S.A. 40:55D-11 as construed in Perlmart, for the notice to omit any reference to such a restaurant. The notice's generic allusion to "retail/office units" would not reasonably alert a recipient of the notice that such a dining establishment was anticipated. Had the notice been explicit about the restaurant, a reader would have had greater incentive to go down to the municipal building and inspect the developer's plans, and/or attend the Board meeting. The notice simply was legally deficient in this regard.[7]
We are not persuaded, however, by plaintiff's other claims of descriptive deficiencies in the notice. Neither the MLUL nor Perlmart requires the notice to be exhaustive. The remaining non-disclosures alleged by plaintiffs generally involve various subjective topics, such as the quality of the stormwater management plan, or other topics that do not involve a description of what the property would actually be used for. Accordingly, we reject the rest of plaintiffs' notice contentions.

III.
We next turn to plaintiffs' arguments concerning the illegal exaction of a $476,000 payment from the developer, and the trial court's deletion of that condition without remanding the project for further public hearings before the Board.
Condition seventeen of the Board's resolution approving Crestwood's application stated as follows:
Applicant will contribute $4,000 per residential [u]nit for recreation improvements to Veteran[s] Park at the time each Certificate of Occupancy is issued.
This condition, like all others listed in the resolution, applied to Crestwood's entire project, including the "use variance[s], bulk variances, preliminary site plan approval for Phases I, II and III, and [the] Final Site Plan approval for Phase [I]." The total cost of the $476,000 contribution is calculated by multiplying $4,000 by 119 units.
The precise genesis of this $476,000 off-tract contribution is not entirely clear from *347 the record. The most detailed explanation about this arrangement was supplied by a Township administrator, Lloyd Jacobs, who addressed the Board after the developer's final witness testified. We present his statement in full:
MR. JACOBS: Thank you. Mr. Chairman, members of the board, the administration has worked very diligently with the applicant on this particular application.

We've had a number of meetings. We believe that this particular proposal is good for the Township, will actually enhance the development and properties in this area.
We have suggested over this period of time a number of changes which you're all familiar with now. Some of the most important one[s] being the reduction of height of these buildings from three stories to two, adding some of the units to the rear, moving a set-back further back. Twin Ponds feature I think is going to be a major aesthetic asset to the area.
So, we are very much in favor of this particular proposal. Some of the comments you've heard from staff get to the quality of the development. We talk about pedestrian accessibility, safety.
The road consistency will be adjacent development, minimizing road cuts, and these kinds of things that are  kinds of comments that we have with all of our applications.
I would say another major feature here with this development is in lieu of providing recreational features on the site with Veterans Park directly across the street. The developer has agreed to contribute $4,000 per unit, which would be one of the conditions for this application and request [to] be granted. $2,000 per unit, which Mayor Gilmore has 
UNIDENTIFIED MALE SPEAKER: [$]4,000.
MR. JACOBS: [$]4,000. What did I say? $4,000 per unit that would be contributed. The mayor has had a vision for some time now to put some fire and some life into the amphitheater proposal for Veterans Park and has asked that we the board (indiscernible) on this application should you decide to go in that direction that the $4,000 per unit contribution would be dedicated towards the design and development of an amphitheater in Veterans Park which is one type of use that we don't have in the park.

The mayor has done an awful lot to enhance the uses in that park and this is what he would like to have that contribution dedicated to. Thank you.
THE CHAIRPERSON: Thank you, Mr. Jacobs.
[Emphasis added.]
This negotiated monetary contribution was incorporated into the Township planner's recommendations to the Board as a condition of the project's approval.
The developer's $4,000 per-unit payment appears to have been intended, at least in part, to respond to the absence from the developer's plans of any on-site recreational facilities for the senior citizens who would be living in the 119 units there. The "RD" zone does not specifically require any such recreational facilities, which flows from the fact that residential units are not, absent a variance, a permitted use in the RD zone. However, such on-site facilities are required in the zoning for Planned Retirement districts outside of an "RD" zone. Hamilton Twp., N.J., Land Dev.Code § 160-88(1)(a). Recognizing that situation, the Township's land use coordinator, Michael Guhanick, wrote a letter to the developer on April 26, 2005, identifying the absence of such on-site recreational *348 facilities as one of five "major planning issues" for the project. In that letter, Guhanick stated:
Finally, the fact that absolutely no recreational amenities are proposed for this adult community is contrary to Township policy and requirements. The necessity to provide recreational amenities similar to that outlined in the Planned Retirement District ordinance is important.

[Emphasis added.]
The record shows that Crestwood already was obligated, as a condition of Board approval, to pay $145,500 into the Township's Transportation Improvement District ("TID") fund. The TID fee is mandatory for developers and funds various transportation-related projects. It is not the subject of any legal challenge here. In his presentation before the Board at the May 24 meeting, the Township's planner, Allen Schectel, referred to both the $145,000 TID fee and the additional $476,000 off-tract contribution as conditions of the proposed approval. As Schectel noted:
The applicant is subject to payment of the TID fee. That's the amount of $145,500. And also, it's traditionally, with senior housing  with the other senior housing that we've had . . . that are condominium ownership  there were recreational facilities built in the projects. Here, they are adjacent to Veterans Park. What the applicants agreed to do is provide $4,000 per unit to the Township, for improvements to be made in Veterans Park. We would suggest that half of that money be paid with Phase One and the remaining half with Phases Two and Three, when that comes up.
Following the presentations at the May 24 meeting, the Board members said little about the $4,000 per-unit contribution. There are abbreviated references to the contribution at the end of the hearing, concerning the timing of the payments, but there was no substantive discussion.
As part of the action in lieu of prerogative writs they filed in the Law Division, plaintiffs challenged the $476,000 payment as an illegal exaction. They argued that the developer's payment lacked a sufficient nexus to any on-site legal obligations of the developer and, therefore, was improperly relied upon by the Board as a reason for allowing the numerous variances sought by Crestwood. Although the defendants initially opposed those contentions of illegality in the Law Division, the Board's counsel[8] advised the judge after oral argument that it would not oppose the court deleting the monetary condition from the approved plans.
The trial court concluded that the $4,000 per-unit contribution was an illegal exaction. The court relied in part upon N.J.S.A. 40:55D-42, which specifically limits off-tract monetary contributions by developers under that statutory provision to "the pro-rata share of the cost of providing only reasonable and necessary street improvements and water, sewerage and drainage facilities, and easements therefor, located off-tract but necessitated or required by construction or improvements within such subdivision or development." The trial court correctly recognized that Crestwood's $4,000 per-unit payment was not designated for those particular sorts of off-site improvements.
The trial court also correctly recognized that a land use board's imposition of a financial contribution for an off-tract *349 purpose "must be authorized by statute and implemented by municipal ordinance." Nunziato v. Planning Bd. of Edgewater Borough, 225 N.J.Super. 124, 131, 541 A.2d 1105 (App.Div.1988). Absent such codified standards, "the possibilities for abuse in such negotiations between an applicant and a regulatory body, no matter how worthy the cause, are unlimited." Id. at 133-34, 541 A.2d 1105. "Approvals would be granted or withheld depending upon the board members' arbitrary sense of how much an applicant should pay." Id. at 134, 541 A.2d 1105.
Consequently, we held in Nunziato that a municipality's "free-wheeling bidding" resulting in a commitment from a developer to subsidize the municipality's general affordable housing fund, as a condition of approval of the developer's site plan application to build condominiums on its property, was "grossly inimical to the goals of sound land use regulation." Ibid. Such quid pro quo arrangements are invalid. See also N.J. Builders Ass'n v. Bernards Twp., 108 N.J. 223, 237-38, 528 A.2d 555 (1987) (invalidating condition that site plan applicant contribute to off-site improvements needed because of general growth throughout the municipality); Tennis Club Assocs. v. Planning Bd. of Twp. of Teaneck, 262 N.J.Super. 422, 433, 621 A.2d 79 (App.Div.1993) (invalidating condition that developer purchase off-tract site for the purpose of improving it); Grand Land Co. v. Twp. of Bethlehem, 196 N.J.Super. 547, 552, 483 A.2d 818 (App.Div.1984) (invalidating condition that subdivision applicant donate off-site land for agricultural use), certif. denied, 101 N.J. 253, 501 A.2d 924 (1985). Indeed, "[o]ur case law has been extremely sensitive to the threat presented by unlawful exactions imposed by a municipality on developers, whether the developers are reluctant or enthusiastic participants in the transaction." Swanson v. Planning Bd. of Twp. of Hopewell, 149 N.J. 59, 67, 692 A.2d 966 (1997) (Stein, J., concurring).
We concur with the trial court that Crestwood's agreed-upon $4,000 per-unit contribution to the Township for off-site improvements to Veterans Park was an invalid condition. Although Veterans Park is across the street from the subject property, there was no guarantee that the Township would build an amphitheatre there, or that Crestwood's financial donation subsequently would be appropriated by the Mayor and Council for that specific purpose. We only know from Jacobs's presentation that the amphitheatre was part of the then-mayor's "vision." There was also no proof in the record forecasting how many residents of Twin Ponds would cross the two lanes of Yardville-Hamilton Square Road and use the park facility.
Moreover, the record is devoid of any proof as to the method by which the $4,000 per-unit figure, and the $476,000 overall contribution, was calculated. No budget figures were supplied. We cannot tell how much the proposed amphitheatre would cost to build or maintain, or what the developer's share of the overall expense would be. The numbers simply have no explanation in the record, other than they were negotiated between Crestwood and the Township administration. This bespeaks the very sort of "free wheeling bidding" we proscribed in Nunziato. The trial court properly declared the condition unenforceable.
The trial court declined, however, to set aside the Board's variance approvals because of the invalid condition. Instead, the court excised the condition, leaving the rest of the Board's determination intact. In support of that approach, the court likened the circumstances here to those in Twp. of Marlboro v. Planning Bd. of Twp. of Holmdel, 279 N.J.Super. 638, 643-44, *350 653 A.2d 1183 (App.Div.), certif. denied, 141 N.J. 98, 660 A.2d 1196 (1995).
In Marlboro we struck down a planning board's insistence that two developers make cash contributions towards the costs of a fire truck and a Township recreation center, because such donations were "beyond the authorization of the [MLUL] statute." Id. at 643, 653 A.2d 1183. However, we did not invalidate the developers' approvals on the whole. We distinguished the facts before us in Marlboro from those in Nunziato, recognizing that
there is no question that the parties [in Marlboro] acted in good faith in respect of the . . . contributions, that those contributions were incidental to and a relatively minor factor in an overall package of legally required contributions, and, perhaps most significantly, that the contributions were viewed by both parties as justifiable because they were intended to be used by the municipality to address anticipated municipal problems attributable to the proposed development.

[Id. at 643-44, 653 A.2d 1183 (emphasis added).]
We also found significant in Marlboro that "the amount of the contributions was reasonably related both to the costs [for the fire truck and recreation center] expected to be incurred and the developer[s'] respective fair share[s] thereof." Id. at 644, 653 A.2d 1183.
In the present case, the trial court determined that the $476,000 contribution from Crestwood was similar to the exactions in Marlboro because the court found that the parties had acted in good faith, the funds were incidental and a relatively minor factor in the overall package, and the funds were intended to be used to address problems attributable to the project. The court did not comment on the additional facet of Marlboro that had recognized a reasonable link between the amount of the developers' "fair share" contribution and the overall costs to be incurred by the municipality.
Although the record is sparse on the subject, we accept the trial court's finding that the proposed $4,000 per-unit contribution represented "a good faith gesture to provide recreational facilities in Veteran[s] Park for the entire community."[9] We also defer to the court's perception that the payment had some nexus to the subject property, in light of the "proximity of Veteran[s] Park to the development[, which] will provide seniors with many recreational and cultural opportunities." We part company with the trial court, however, in its conclusion that the donation was an "incidental" and "relatively minor" factor in approval of the developer's land use application.
To the contrary, the Township administrator who addressed the Board, Jacobs, characterized the $4,000 per-unit charge as a "major feature" of the plan, one provided "in lieu of providing recreational features on the site."[10] No one at the hearing *351 expressed disagreement with that characterization. The characterization dovetails with earlier correspondence from the Township's land use coordinator, Guhanick, stressing to Crestwood, as a "major planning issue," the "necessity" for the developer to provide recreational amenities, which Guhanick underscored as "important."
Although the Board members at the May 24 meeting did not say much about the exaction, we do not regard their relative silence as indifference. According to Jacobs, the mayor wanted the amphitheatre built as part of his "vision," that his administration had "worked very diligently with the applicant," that "a number of meetings" had taken place, and that Crestwood's donation would "put some fire and some life into the amphitheatre proposal." It is not inconceivable that the Board members regarded the negotiated contribution as a fait accompli, and thus had little incentive to second-guess it. Given the context, we do not share the trial court's sense that this half-million dollar payment was a minor and insignificant aspect of the approved plan.
As illustrated in Marlboro, our case law affords the courts, in appropriate situations, the discretion to excise from a land use approval an invalid condition. See, e.g., Berninger v. Bd. of Adj. of Midland Park, 254 N.J.Super. 401, 407 (App. Div.(1991) (excising an invalid condition on a variance that had been in place for over fifty years), aff'd, 127 N.J. 226, 603 A.2d 946 (1992); Sherman v. Borough of Harvey Cedars Zoning Bd. of Adj., 242 N.J.Super. 421, 434-35 (App.Div.1990) (excising a height restriction imposed as a condition to a variance issued to renovate a dwelling, where the zoning board had imposed that condition as the apparent consequence of an "internal inconsistency" in the builder's plans, and where a "careful reading" of the hearing transcript did not support a conclusion that the height restriction truly was "material to [the board's] grant of a variance"), certif. denied, 122 N.J. 404, 585 A.2d 402 (1990).
Conversely, in other situations, the invalid condition may have been of such sufficient importance that the board might have chosen to deny the application, on legitimate grounds, without it. In such circumstances, the courts have remanded the matter back to the municipal board for a new determination on the merits. See, e.g., Houdaille Constr. Materials, Inc. v. Bd. of Adj. of Tewksbury Twp., 92 N.J.Super. 293, 304, 223 A.2d 210 (App.Div.1966) (remanding matter back to Board to reconsider the grant of variance after ten illegal conditions were stricken); Gayatriji v. Borough of Seaside Heights Planning Bd., 372 N.J.Super. 203, 219-20, 857 A.2d 659 (Law Div.2004) (finding that an illegal condition that a motel operate only on a seasonal basis was "inseparable from the variance" allowing more units, and that both the condition and the variance must be stricken). See also Cox, supra, § 28-4.3.
Because we are persuaded that the $476,000 illegal exaction was not a minor factor, and that the subsidized improvement of Veterans Park was an important attempt to mitigate the absence of any recreational amenities on the project site, we conclude that the better course here would have been to remand the matter for reconsideration before the Board. It is readily conceivable that a neighbor, an interested resident, or a member of the Board might have objected to Crestwood's plans, or at least might have urged Crestwood to undertake alternative beneficial measures, if the project had been represented to the Board without its half-million *352 dollar sweetener. For example, a remand might have prompted local residents, or the Board itself, to explore with Crestwood whether its building plans on this 10.9-acre site could be modified or scaled back to accommodate the recreational needs of the senior citizens who will be living there, thus lessening the demands they would place on public or private recreational facilities off site. We appreciate the equitable force of plaintiffs' assertion in their brief that the court's excision of the developer's substantial contribution to a public park could leave residents "worse off" rather than better off.
We therefore reaffirm the trial court's well-supported and unappealed finding that the developer's $476,000 negotiated contribution was an improper exaction. However, we also conclude that the condition should not have been excised without affording the public an opportunity on remand to address the ramifications of that excision. The matter now should return to the Board for such a supplemental public hearing.

IV.
Our independent conclusions in Parts II and III of this opinion, that the developer gave inadequate public notice of the proposed restaurant and that the Board should have renewed public hearings on the Crestwood application once the $476,000 exaction was nullified, make it unnecessary for us to address, at this time, the balance of plaintiffs' arguments. Since the matter must be reconsidered by the Board,[11] we anticipate that a fuller record concerning this project will be created in the near future. Such a record may well include expert testimony offered by plaintiffs or other potential objectors, as well as responsive proofs and supplemental expert opinions on behalf of the developer. The Board itself and the municipality's own experts may have additional insight, questions, or proofs.
Given these prospective events, it would be unwise to rule now on plaintiffs' other arguments, i.e., that the project as a whole fails to satisfy the positive and negative requirements for a variance under N.J.S.A. 40:55D-70 and Medici v. BPR Co., 107 N.J. 1, 18, 526 A.2d 109 (1987); that the project embodies improper "zoning by variance," see Saddle Brook Realty, LLC v. Twp. of Saddle Brook Zoning Bd. of Adj., 388 N.J.Super. 67, 80, 906 A.2d 454 (App.Div.2006); that the approvals lack substantial credible evidence in the record; and that project's stormwater management plan is inadequate. Those issues should abide the remand, and should not be preempted by a preliminary opinion of this court based upon the present record amassed before the Board in the absence of any objectors.
The efficacy and scope of a remand is complicated, however, by the fact that the project has already been substantially constructed, according to what we recently learned from counsel at oral argument. In particular, we have been informed that at least one of the four buildings for age-restricted housing is nearly complete, and that senior citizens may begin to lease and occupy those units as early as January 2008. We also have been advised that the site preparation work for all of the other buildings has been performed, and that *353 various contracts have been executed and are being implemented.
Plaintiffs had sought a stay of construction, pending appeal, before the Law Division. In considering that motion, the trial court found that Crestwood had "made a conscious business decision to proceed with preliminary stages of development," and that it would "assume[] the risk of paying for these costs and restoring the site should the Appellate Division modify the decision by the Board and the trial court." The trial court thus denied the requested stay.[12]
Plaintiffs urge that we should impose what they characterize as the "normal remedy" of reversing and remanding the judgment, in the meantime halting further construction on the site. Plaintiffs also suggest that the court consider requiring the developer to dismantle unlawfully built structures on the site. See Bubis v. Kassin, 184 N.J. 612, 631, 878 A.2d 815 (2005); Steiger v. Lenoci, 323 N.J.Super. 529, 537, 733 A.2d 1192 (App.Div.1999); Blaine v. Ritger, 211 N.J.Super. 644, 656, 512 A.2d 553 (App.Div.), certif. den., 105 N.J. 546, 523 A.2d 183 (1986). We are not certain that such drastic interim measures disrupting the status quo are warranted, particularly because senior citizens, contractors, vendors and other innocent third parties may be unduly harmed by such an injunction. Moreover, the variances may well be reaffirmed by the Board, in full or in part, on remand and thereafter might be sustained on renewed consideration in the Law Division.
We simply do not have sufficient factual information, nor sufficient prescriptive suggestions from the litigants, to determine the most sensible interim solution to this practical quandary. In one respect, as a consequence of our ruling about the flaw in the notice, the restaurant's construction must cease for the time being, as the Board lacked jurisdiction to approve the restaurant without proper notice. The other components and conditions of the project, to the extent they are challenged, may also be re-examined by the Board on remand, as a consequence of invalidating the $476,000 exaction.[13] However, it is not readily apparent, from the limited information we have before us, whether the balance of equities favors the immediate discontinuation of some or all of the ongoing construction not involving the restaurant. See Crowe v. De Gioia, 90 N.J. 126, 134, 447 A.2d 173 (1982).
For these reasons, we refer the delicate issues of interim relief initially to the Law Division, again with the exception that the restaurant shall not be further constructed until the proceedings on remand concerning the restaurant are concluded. Accordingly, the Law Division shall conduct a case management conference within fourteen days of this opinion, inviting counsel to present at such a conference their practical suggestions as well as pertinent facts and circumstances that may aid the court in resolving these sticky time-sensitive issues. We encourage counsel to confer and attempt to narrow, or perhaps resolve altogether, these interim issues in a manner that may reasonably accommodate the important public and private interests involved. The Law Division shall also address with counsel the establishment of an expeditious schedule for the renewed hearings before the Board, the *354 scope of those hearings, and the need for testimony beyond the testimony that was originally presented.
Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.
NOTES
[1] They are Albert and Cindy Britton, Carl Markau and David Ardente. All of them are residents of the Briarwood subdivision located on the west side of Yardville-Hamilton Square Road, directly across from the subject property.
[2] Although the trial court found that subsequent published notices listed the correct section number, the record supplied to us reflects that these notices, detailing the April 12 and May 10 Board meetings, list only the application number for the Crestwood project, and do not list any section or block number.
[3] The record does not reflect that any objectors were present at the April 12 meeting, although plaintiff Ames Hoyt attended part of the May 10 meeting.
[4] See, e.g., Drum v. Fresno County Dep't of Public Works, 144 Cal.App.3d 777, 192 Cal. Rptr. 782, 786 (1983); Shrobar v. Jensen, 158 Conn. 202, 257 A.2d 806, 809 (1969); Appeal of Booz, 111 Pa.Cmwlth. 330, 533 A.2d 1096, 1098 (1987).
[5] Moreover, Crestwood's own experts at the Planning Board hearing treated the restaurant, being within this mixed-use development of less than one hundred acres, as requiring a variance. The Board's resolution states that Crestwood's counsel had specifically acknowledged to the Board that "restaurants . . . are not permitted uses in the RD Research and Development Zone. Therefore, the variance requests . . . noted that such mixed uses are permitted on larger tracts in the zone[,] but the property in question does not meet this lot size requirement." The Township's planning expert similarly concluded, in a February 16, 2005 memorandum to the Board, that the restaurant would require a variance because the site is in the RD zone and under one hundred acres.
[6] We are mindful that the Board had no authority to grant a liquor license, which would have to be pursued separately before the Township's governing body. See N.J.S.A. 33:1-24; see also Hamilton Twp., N.J., Mun. Ordinances § 2-421 and § 14-33 (1979). Even so, the developer's land use application and all of the relevant comments before the Board, clearly envisioned that such a license would be pursued for what was described as a "quality restaurant" on site. It is unclear from the record whether the restaurant owner anticipates a service bar to provide drinks solely to customers who are dining on the premises, or instead wants to operate a full-service bar, a feature that might generate additional public concerns.
[7] In expressing these conclusions relating to notice, we by no means imply any views about the merits of the restaurant or its inclusion in the project, and whether it satisfies the positive and negative standards for a variance under N.J.S.A. 40:55D-70.
[8] Other than counsel's letter, the record supplied to us contains no formal resolution from the Board itself confirming its amenability to the deletion.
[9] Despite our necessary use of the term of art "illegal exaction," which may have pejorative connotations, we note that there is no allegation that any public official or political organization was to benefit from the developer's contribution. The term applies, as the case law instructs, irrespective of the good faith of the participants involved. See Swanson, supra, 149 N.J. at 67, 692 A.2d 966.
[10] The record also reflects that Jacobs formally reviewed the Crestwood application in his capacity as the Township's administrative officer, and issued a memorandum on May 5, 2005 deeming the application complete and suitable for the Board's substantive consideration. Given Jacobs's official role in the application's review process, his characterization of the $476,000 contribution as a "major" aspect of the project is particularly noteworthy.
[11] Although we are satisfied that the inadequate notice concerning the restaurant and the invalidity of the developer's $476,000 off-site contribution each independently warrants a remand, the cumulative effect of those two deficiencies only strengthens the need for the Board to reconsider the project and to afford the public another opportunity for notice and comment.
[12] Plaintiffs did not renew their stay application before this court, although they unsuccessfully moved to have the appeal accelerated.
[13] Such a rehearing may also moot plaintiffs' specific claim raised on this appeal that certain exhibits discussed at the original hearing were never formally moved into evidence, and that the variances are therefore invalid.