**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3944-21

DEBRA SUZETTE GRIMM,

    Plaintiff-Appellant,

v.

WALL TOWNSHIP ZONING
BOARD OF ADJUSTMENT,
DBI PROPERTY MANAGEMENT,
LLC, and DEARBORN
BUILDERS, INC.,

    Defendants-Respondents.

_____

Argued October 17, 2023 – Decided November 17, 2023

Before Judges Whipple, Enright and Paganelli.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-3790-20.

Zoe N. Ferguson argued the cause for appellant (Lieberman Blecher Sinkevich, PC, attorneys; Stuart J. Lieberman, of counsel and on the briefs; Zoe N. Ferguson, on the briefs).

Thomas J. Hirsch argued the cause for respondents DBI Property Management, LLC, and Dearborn Builders, Inc.

PER CURIAM

In this zoning matter, plaintiff Debra Suzette Grimm appeals from the March 16, 2022 order dismissing with prejudice count two of her complaint in lieu of prerogative writs against defendants Wall Township Zoning Board of Adjustment (Board), DBI Property Management LLC (DBI PM), and Dearborn Builders, Inc (DBI).[1]  We affirm.

I.

We discern the facts from the motion record.  Edward Dearborn is the principal owner and officer of DBI, and the sole member of DBI PM.  DBI has been in the business of constructing custom homes in Monmouth and Ocean Counties since 2001.

In November 2018, DBI purchased property at 2422 Route 34 in Wall Township (the Property).  Two months later, Dearborn filed an application with the Board, seeking a use variance, bulk variance relief, and a waiver of site plan

---

[1]  Notably, plaintiff does not appeal from the August 27, 2021 and July 27, 2022 orders, respectively dismissing with prejudice counts one and three of her prerogative writs complaint.

A-3944-21

approval. In his application, Dearborn stated he "propose[d] to use a portion of the existing building [on the Property] for office space . . . and the remainder of the building [would] be used for the manufacture of custom cabinets, windows and doors to be utilized in the homes which [DBI] constructs." Subsequently, DBI PM and DBI generated a public notice in a local newspaper about the use variance application, confirming Dearborn intended to use the Property "for office space and a woodshop for the fabrication of custom wood cabinetry." Dearborn needed a use variance to conduct his business on the Property because a prior use variance issued for the Property was "for a manufacturing use . . . limited to [the] manufacture of canvas sails."

Plaintiff lives directly across the street from—and within 200 feet of—the Property. She received no notice of Dearborn's application, as required under N.J.S.A. 40:55D-12(b). The parties agree the lack of notice stemmed from: (1) the inadvertent omission of plaintiff's name from the certified list of properties within 200 feet of the Property maintained by Wall Township's Tax Assessor; and (2) the fact Dearborn's attorney properly relied on that incomplete list to notify nearby property owners about the use variance application.

On March 6, 2019, the Board conducted a public hearing on Dearborn's application. During Dearborn's testimony, his attorney asked him to describe

3 <span>A-3944-21</span>

"the type of woodworking activity and the type of equipment that [he] . . . propose[d] to have in the building" on the Property. Dearborn replied:

> It's a very standard woodworking shop, large joiners, table saws, planers, things of that nature. The wood comes in, it typically gets delivered rough. We . . . use . . . maple, [and] mahogany . . . . [I]t . . . sits on a shelf in a controlled environment and stabilizes over time.
>
> . . . We're basically . . . pulling wood off the shelf, sizing it on the machinery and then moving forward to shaping it into cabinets or railings or whatever it is.

Dearborn's counsel then asked Dearborn to tell the Board "about the types of woodworking equipment that [he had] and the types of air filtration equipment that [he] use[d] to ensure that none of the fumes or the sawdust leave the premises." (Emphasis added). Dearborn answered:

> So anyway, like I said, table saws, joiners, planers, all of the machines are hooked up with a series of pipes which go into a dust collection system and then from there[,] . . . the dust from the machines drops into bags. It's bagged and then we bring it out and put it in the dumpster.
>
> [(Emphasis added).]

Dearborn also stated he operated his Point Pleasant facility the same way. Accordingly, his attorney asked if Dearborn had "had any complaints or

problems with respect to any sort of odor." Dearborn responded, "no, never. No."

Dearborn's engineer, Jeffrey Carr, also testified at the March 6 hearing. He stated Dearborn's proposed use did not include selling cabinets "for retail." Instead, the cabinets would be "custom built." In describing "the positive criteria and the particular suitability of this site for . . . Dearborn's use," Carr stated, "[w]e are effectively doing no improvements to the site. We're not expanding it." Additionally, Carr testified Dearborn's proposed use of the property was "not something that w[ould] be a change in the neighborhood."

When Dearborn's attorney asked Carr if "the Board could grant this use variance without substantially, detrimentally impacting the zone plan or the zoning ordinance," Carr answered, "[a]bsolutely." Also, in response to Dearborn's attorney's question about whether there would be "any negative impact on the surrounding properties or the surrounding neighborhood from the grant of the use variance," Carr responded, "[n]o, none whatsoever. In fact, I think that's a positive rather than [a] negative."

The Board unanimously approved the use variance, subject to various conditions, including: a restriction on Dearborn's use of off-site parking; a prohibition on "outdoor storage or fabrication," and the need for him to "return

5

to th[e] Board" to "obtain[] appropriate use variance and approval" for "[a]ny expansion of the existing building." On March 20, 2019, the Board published Resolution 01-2019 (2019 Resolution), memorializing its approval of the use variance, as well as "the grant of bulk variance relief . . . and the waiver for preliminary and final site plan approval," subject to Dearborn's compliance "with all the . . . conditions which [were] made a continuing part of th[e] resolution of approval." The resolution included the Board's approval for the Property to be used "as an office and millwork and trim woodwork production site for items intended to be incorporated in construction conducted off[-]site."

The 2019 Resolution also referenced Dearborn's testimony from the March 6 hearing, noting he "propose[d] to use a portion of the existing building [at the Property] as office space and the remainder of the building . . . for the fabrication and millwork of custom cabinets, windows and doors to be incorporated in homes which [DBI] constructs off site" and to meet with "prospective customers." Additionally, the resolution also referred to his testimony that, "[a]ll of the machinery utilized in connection with woodworking [would be] connected to dust collector systems[,] which ma[de] the removal of dust from the premises extremely efficient and safe."

Further, the 2019 Resolution referenced Carr's testimony from the March 6 hearing, stating he opined that "because of the self[-]contained nature of the fabricating activity and the limited on[-]site storage of lumber[,] as well as the efficient removal of dust and particulates from the air, these carefully managed activities [would] not have any impact upon the surrounding residential property uses." (Emphasis added).

In April 2019, Dearborn applied for a zoning permit to install a "Binks Open Face Spray Booth" and a "paint booth exhaust" on the Property. Neither he nor his engineer had mentioned an intent to install these items when they testified at the March 6 public hearing. Dearborn received approval for the permit on August 2, 2019, and began using the spray booth "on or about September 29, 2019."

Plaintiff never appealed from the issuance of the zoning permit for the spray booth or its exhaust system, even though she noticed they "discharge[d] . . . noxious chemicals and fumes into the air through the roof-top discharge stack" "on a regular basis." In fact, soon after Dearborn started using the spray booth, she contacted him about her observations. Dearborn advised her he would do what he could to resolve any odor issues.

A-3944-21

Plaintiff subsequently lodged complaints about the spray booth and exhaust system with local and county officials, and the Department of Environmental Protection, expressing concern about the odors coming from the Property. However, Dearborn was never cited for any violations related to his use of the spray booth and exhaust pipe, including any violations of Wall Township's odor ordinance.

In November 2019, Dearborn filed an application for a second use variance, seeking to expand the square footage of the first and second floors of the building on the Property to accommodate a showroom and second-floor office space for employees. The architectural plans accompanying his application showed the existing spray booth and exhaust pipe on the Property.

Plaintiff received notice of the second use variance application and appeared at the May 20, 2020 public hearing to address it. When the Board elicited public comment, plaintiff testified she'd "had a few conversations with . . . Dearborn about the smokestack and the fumes that [were] . . . coming over to [her] property and . . . to the businesses next door." She stated Dearborn "had discussed . . . maybe . . . doing something so that the fumes [went] out towards Route 34," so she "wanted to see how that[ was] going to be addressed."

The Board invited Dearborn to respond to plaintiff's inquiry. He testified he intended "to move the exhaust pipe for the spray booth . . . to the east o[f] the building," and had ordered "parts and [a] filter . . . for that and [was] waiting for [them] to come in." The Chairwoman asked plaintiff to describe the fumes she detected and "how often" she smelled them. Plaintiff answered,

> It's horrific. . . . [I]f I'm out in the backyard[,] I have to go inside. . . . Sometimes I'll smell it as long as [twenty] minutes, but as often as they paint is as often as I'll smell it if I'm out in the yard. . . . I think they're painting twice a day now, . . . so if I'm outside when they're painting[,] I have to go in my house.
>
> And I know the businesses on either side, they smell it as well. So[,] it's pretty bad. And . . . I've talked to . . . Dearborn[] a few times and he's been very kind to try different solutions[,] but nothing seems to have worked.

In response to further questioning from the Board, Dearborn stated if he rerouted the exhaust pipe connected to the spray booth and vented it away from plaintiff's property, he believed "it would . . . push the fumes out to the Route 34 side of the building" and plaintiff would no longer smell the odor. The Board's attorney remarked, "there must be some type of standard here that [DBI PM and DBI] have to comply with," prompting the following exchange:

> BOARD MEMBER McBARRON: I don't remember this coming up in the first [use variance] application.

BOARD MEMBER HEARN:  Me neither.

CHAIRWOMAN DeSARNO:  I don't recall it either.

[BOARD'S COUNSEL]:  There was no discussion . . . about [a] spray booth.

[UNIDENTIFIED] BOARD MEMBER:  No, there was not.

After this exchange, Dearborn's counsel asked to adjourn the hearing to allow Dearborn time to "ameliorate th[e] condition" plaintiff described.  The Board agreed and postponed the matter.

When the Board reconvened on July 8, 2020, Dearborn testified he upgraded the spray booth's exhaust system and reduced the odors emanating from it.  He explained:

> [I]nitially, <u>when I set up the spray booth</u>, it was running at a very high rate of speed.  And what was happening was <u>the actual paint was being sucked up and exhausted out of the building which . . . made the odors, you know, bad.</u>
>
> I [installed] . . . a manometer[,] and that reduce[d] the speed of the fan[,] and that stopped pulling the paint up the dust pipe and solved the odor issue.
>
> . . . [W]e also installed a velocity cone on top of the exhaust[,] . . . . allow[ing] the fan to run at a much higher rate of speed and it exhausts the fumes from the building at a higher rate of speed.

A-3944-21

[(Emphasis added).]

Similarly, Dearborn's architect testified about the upgrades to the spray booth's exhaust pipe.  He stated:

> [W]e [installed] this flow meter . . . which basically senses the fumes, and then runs the fan accordingly.  So it does not suck out any more air than . . . required. . . .
>
> . . . .
>
> . . . [I]f the problem still persists, then[,] of course[,] we will think of . . . additional remedies.  But for now[,] I think it's a pretty good solution . . . we came up with.

Plaintiff also testified at the July 8 hearing.  She stated:

> [M]y major issue has been the smell and I am worried going forward.  I mean, it's certainly a lot better.  In the beginning [Dearborn] said something was broken on [the spray booth] and . . . honestly it smelled like something had exploded, a glue factory had exploded. . . .  [I]t's not as bad but I . . . didn't move here to have to smell factory fumes at all. . . .  You know, I have the nice sea breeze.  That's what I want to smell.  I don't want to smell chemicals in the air.

After plaintiff asked the Board what could be done if the odor problem persisted, a Board member asked Dearborn how frequently the spray booth operated in a "typical week[,] generating any kind of smell at all."  Dearborn answered, "it's different from week to week, but . . . . I would say maybe an hour, two hours a day."

11

A-3944-21

Before the Board voted on the second use variance application, Dearborn's engineer advised the Board,

> I think we're heading in the right direction. The only point I want to make is . . . the spray booth is part of the operation in the sense that it was [already] approved on the [prior] use variance. That's not part of the application tonight[,] for the spray booth, it just happens to be an issue that was brought up.
>
> [(Emphasis added).]

The Board unanimously approved the second use variance application at the conclusion of the July 8 hearing, subject to various conditions of approval placed on the record. On October 7, 2020, the Board issued Resolution 6-2020 (2020 Resolution), formally approving the application and permitting Dearborn to expand the building on the Property "to include an additional 1,163 square feet of second floor office space" and "a new first floor one[-]story [ninety-three] square foot addition." The 2020 Resolution expressly stated:

> the Board expects that [Dearborn] shall comply with all pertinent [T]ownship ordinances or county regulations with regard to the emission or discharge of odors from this facility. The Board is aware that the spray booth was a part of the operation that was previously approved by this Board (Resolution No. 1-2019).
>
> . . . [Dearborn] is expected to comply with Township Ordinance Section 140-171 relating to odors[,] and further agrees that should a nuisance be

> determined to exist that [he] will address those
> offens[ive] odors with a view towards removal of same
> or, in the alternative, shall return to this Board to
> identify a methodology that will ensure proper and safe
> containment. The . . . justification for grant of use
> variance relief set forth in the Board's prior resolution
> is again affirmed.
>
> With the resolution of the odor problem
> emanating from the spray booth, the benefits of this
> application as a whole advance the purposes of the
> zoning including the public welfare.
>
> [(Emphasis added).]

In November 2020, plaintiff filed a three-count complaint in lieu of prerogative writs against the Board, DBI PM, and DBI. In count one, she alleged that when Dearborn requested the first use variance, he "misrepresented . . . the [Property] would be used solely for the fabrication of cabinetry and millwork for off-site assembly into custom homes . . . and would be entirely self-contained within the structure." In count two, plaintiff asserted that when Dearborn applied for the second use variance, he "failed to . . . meet the substantial requirements to justify a use variance" and "continued to misrepresent the use, and the extent of the use and discharge of the spray booth . . . and the impact of the noxious fumes being discharged into the air from the site." Finally, plaintiff alleged in count three that "[t]he fumes . . . emitted from the [Property] are noxious and offensive in smell, are believed to possibly create or aggravate

13 <span>A-3944-21</span>

health . . . problems[,] . . . and generally create a nuisance . . . to nearby residents, including . . . [p]laintiff."

Based on these allegations, plaintiff asked for a judgment: (1) "[i]nvalidating the March 20, 2019 Resolution"; (2) "invalidating the . . . 2020 [Resolution] and requiring [DBI PM and DBI] to remove any and all expansions of the site"; (3) enjoining DBI PM and DBI from "all future operations on the [P]roperty, inclusive of the spray booth"; and (4) awarding her punitive damages, counsel fees and costs.

In May 2021, DBI PM and DBI moved for partial summary judgment to dismiss the first count of the complaint, alleging it was time barred under Rule 4:69-6.[2] In the statement of uncontested material facts supporting the motion, counsel for DBI PM and DBI represented that Dearborn incurred over $532,000 in construction and improvement costs after the Board approved the first use

---

[2] Rule 4:69-6(a) provides "[n]o action in lieu of prerogative writs shall be commenced later than [forty-five] days after the accrual of the right to the review, hearing or relief claimed, except as provided by paragraph (b) of this rule." The Rule "is designed to give an essential measure of repose to actions taken against public bodies." Tri-State Ship Repair & Dry Dock Co. v. City of Perth Amboy, 349 N.J. Super. 418, 423 (App. Div. 2002) (quoting Wash. Twp. Zoning Bd. of Adjustment v. Wash. Twp. Plan. Bd., 217 N.J. Super. 215, 225 (App. Div. 1987)).

A-3944-21

variance. Plaintiff opposed the motion and cross-moved for partial summary judgment on the first and third counts of her complaint.

Judge Owen C. McCarthy heard argument on the cross-applications on August 27, 2021. During the hearing, plaintiff's counsel opposed dismissal of the first count of the complaint and claimed the judge should extend the time limits under Rule 4:69-6[3] because "[i]t wasn't until [Dearborn's] second application in . . . 2020 that [plaintiff] understood . . . there was an allegation . . . th[e spray] booth was approved in 2019." Judge McCarthy rejected this argument, finding no "basis under [Rule] 4:69-6 to expand the

---

[3] Under Rule 4:69-6(c), a "court may enlarge the period of time provided in . . . [Rule 4:69-6(a)] where it is manifest that the interest of justice so requires." We have broadly interpreted the ability of a trial court to enlarge the time period for filing a complaint in lieu of prerogative writs. See Cohen v. Thoft, 368 N.J. Super. 338, 345-47 (App. Div. 2004) (holding the "interest of justice" standard under Rule 4:69-6(c) exceeded the categories of cases previously identified as subject to enlargement, namely cases "involving[:] (1) important and novel constitutional questions; (2) informal or [e]x parte determinations of legal questions by administrative officials; and (3) important public rather than private interests which require adjudication or clarification"); see also Mullen v. Ippolito Corp., 428 N.J. Super. 85, 106 (App. Div. 2012). Thus, those three categories were "not intended to be exhaustive." Hopewell Valley Citizens' Grp. v. Berwind Prop. Grp. Dev. Co., L.P., 204 N.J. 569, 583-84 (2011). Our Supreme Court also has instructed that even when "the right to relief has accrued, the interests of justice require, at least, that the litigant be permitted . . . to exhaust all administrative remedies before commencing an in lieu action." Schack v. Trimble, 28 N.J. 40, 49 (1958).

[forty-five]-day period." Accordingly, he entered an order, granting DBI PM and DBI's partial summary judgment motion and dismissing the first count of plaintiff's complaint. He also signed a companion order on August 27, denying plaintiff's cross-motion.

In January 2022, Judge McCarthy heard argument regarding plaintiff's request under count two of her complaint to invalidate the 2020 Resolution. Plaintiff's counsel contended this relief was appropriate because the Board arbitrarily and capriciously granted DBI PM and DBI a second use variance based on the false premise the spray booth was part of the operation approved in the 2019 Resolution. Counsel explained, "[t]he problem is . . . that while the 2020 [R]esolution . . . state[d] that [the spray booth] was approved as part of the 2019 [Resolution], the spray booth was never mentioned once, not even by word or by concept[] in 2019." Additionally, counsel contended "it would appear . . . there was an attempt to hide [the spray booth]. . . . because in 2019 when . . . Dearborn was asked [at the March 6 public hearing] to explain his [woodworking] process[,] . . . he didn't indicate anything at all about a . . . spray booth." Dearborn "was asked expressly about odors by his attorney, . . . and his response related to . . . sawdust, and that was it."

Plaintiff's counsel added:

A-3944-21

The spray booth's a big deal. It actually cuts through the roof and it's vented. And so, it's not . . . an incidental piece of equipment[,] . . . and when it's vented, the odors . . . are released into the environment . . . .

. . . [Y]ou would poison everybody if you didn't vent it. . . . It's a big deal and yet . . . never once was it mentioned.

Further, counsel argued that while DBI PM and DBI posited it was common knowledge that a spray booth would be included in "a cabinet-making operation," "there [were] no experts that sa[id] that," and "the owner of the business didn't mention it when he was asked to explain the [woodworking] processes" at the March 6, 2019 hearing.

In response, counsel for DBI PM and DBI stated that in 2020, when "the Board [considered Dearborn's] . . . application to expand the use variance previously granted" it "clearly had jurisdiction to continue any discussion it want[ed] . . . about the . . . ongoing operation of the . . . business." Additionally, counsel stated the Board took plaintiff's concerns about odor issues "very seriously" during the 2020 public hearings and it "concluded that if there[ were] future]. . . complaint[s]" about odors that could not be resolved, Dearborn "would have to come back to the Board." Counsel also argued the Board did not perceive the odor issue "as something that . . . prevented [it] from granting the

17

[second] use variance, but simply as an operational aspect that [it] need[ed] to take control of and make sure it[ was] operating correctly."

Counsel for DBI PM and DBI also highlighted that Dearborn "spen[t] hundreds of thousands of dollars" in reliance on permits and use variance approvals he received. Further, counsel emphasized that plaintiff never timely appealed from "the zoning permit and the construction permits that were issued specifically for the spray booth." He noted such determinations by an administrative official were "appealable to the . . . Board within [twenty] days" and plaintiff was "way, way beyond that."

On February 10, 2022, the judge issued an oral opinion, dismissing count two of plaintiff's complaint. He explained that "[t]he action of [a] local Board is presumed to be valid" and it was plaintiff's burden to show the Board's actions in approving the second use variance were arbitrary, capricious, or unreasonable. Finding plaintiff failed to meet her burden, the judge stated:

> [a]lthough the 2020 [R]esolution mention[ed] the spray booth, the spray booth was not the basis for the second application . . . heard in 2020. . . . [P]laintiff's argument that the mere reference to the spray booth during the 2020 hearing resets the clock for purposes of challenging the Board's 2019 [R]esolution of approval is contrary to the time provisions set forth in Rule 4:69-6(a).

18

Accepting . . . [p]laintiff's arguments would essentially make the [forty-five] day window to commence an action in lieu of prerogative writs meaningless.

Moreover, in following the [forty-five]-day window for appeal to the Superior Court, applicants receiving variance relief from land use boards are entitled to rely upon approvals that are not timely appealed to the Superior Court and act upon those approvals by commencing construction, which is precisely what occurred in this matter . . . .

. . . [F]ollowing the passage of the [forty-five] day[s] for appeal [from the first use variance], [DBI PM and DBI] relied upon the variance relief and engaged in significant expenditures for the variance involving the manufacture of custom cabinets, doors, windows and other millwork for use in custom homes.

Plaintiff's arguments that [a] reference to the spray booth in the 2020 [R]esolution permits a second attempt to dispute the validity of the 2019 [R]esolution . . . remains contrary to New Jersey law and is untimely.

Nevertheless, and to ensure a complete review for an appellate review that may follow, [p]laintiff's argument focuses on Paragraph Ten of [the] 2020 [R]esolution[,] which provides, "[t]he Board is aware that the spray booth was a part of the operation that was previously approved by this Board." . . .

Plaintiff argues that since the 2019 application and [R]esolution did not specifically identify the spray booth, which required a use variance that was not included in the notice, the Board . . . lacked jurisdiction to address the spray booth . . . .

19

Plaintiff has not challenged any other part of the relief provided by the 2020 approval and [R]esolution concerning the increased office space or site plan relief.

Plaintiff maintains that since the spray booth was . . . never addressed and/or discussed during the 2019 application, any purported approval of the spray booth in the 2019 application and [R]esolution, and reliance therein in 2020, was arbitrary, capricious[,] and unreasonable, and not supported by the record, requiring the invalidation of the . . . second application in 2020.

Plaintiff argues since DBI [PM] and [DBI] did not identify the spray booth in either application, notice was deficient [and] the Board lacked jurisdiction, which is fatal to any approval that may have been given by the Board.

. . . .

The notice requirements are clearly set forth in the Municipal Law Use Law [N.J.S.A. 40:55D-1 to -136 (MLUL)]. N.J.S.A. 40:55D-12 requires that at least ten days prior to most zoning and land use proceedings, a developer must give public notice to certain designated groups and persons of the matters to be considered in such proceedings.

Notice shall be given to all . . . real property owners located within 200 feet in all directions of the property . . . .

N.J.S.A. 40:55D-11 further mandates that such notice must contain certain specific information[,] including the date, the time and the place of the hearing, [and] the nature of the matters to be considered . . . .

. . . .

Proper public notice in accordance with the requirements of the [MLUL] is . . . a jurisdictional prerequisite for a zoning board's exercise of their authority.

. . . .

The [Supreme] Court [has] confirmed the notice statute requires a commonsense description of the nature of the application such that the ordinary lay[person] can understand its potential impact upon [them].

Consistent with this authority[,] . . . the court finds that . . . [DBI PM] and [DBI] were not required to provide notice for the spray booth during the 2020 application.

The 2020 application sought variance relief involving only . . . an increase in office space and . . . site plan relief. Since the spray booth was not an item for which variance relief was sought, no reason existed for [DBI PM and DBI] to include the spray booth in the 2020 notice under the [MLUL].

Rather, the issue of the spray booth was interjected into the hearing by the [p]laintiff due to her complaints to the Board, which the entire evidentiary record in this case confirmed the [p]laintiff had been aware of for several months and had been the subject of prior complaints to various officials associated with the Township of Wall.

The Board allowing [p]laintiff's comments involving the already-installed spray booth did not deprive the Board of jurisdiction to address the matters

21

that were properly noticed and before the Board in its . . . resolution, [specifically,] the increase in second floor office space and site plan issues.

Simply, there was no reason to include the spray booth in the notice under the [MLUL] because it was not part of the 2020 application. Moreover, and as confirmed in the prior order granting summary judgment[,] and in this opinion, the court has already determined that any attempt to challenge the 2019 [R]esolution, including notice, is time-barred.

Lastly and as previously stated, the role of this court when addressing an action in lieu of prerogative writs is intended to be a determination of the validity of the Board's action, not a substitution of the court's judgment therefore. . . .

The proper scope of judicial review is not to suggest a decision that may be better than the one made by the Board but to determine whether the Board could reasonably have reached its decision on the record before it. . . .

In Paragraph Ten of the resolution, the Board determined that the spray booth was part of the system that was approved during the 2019 application.

The court agrees with [DBI PM and DBI] that the applicant is not required to . . . identify each . . . piece of equipment that would have been utilized in the manufacturing of custom kitchen cabinets, doors, windows[,] and other millwork for the use in custom homes.

There is nothing arbitrary and capricious or unreasonable in the Board's determination that a spray booth was part of the operation that was previously

22

approved by the Board in 2019, and the court will not second-guess its judgment for that [of] the Board . . . .

Accordingly, the court will not invalidate the . . . [2020] Resolution[] and order the removal of the spray booth. The request for relief in [c]ount [t]wo of the complaint is denied.

. . . .

So, the second count of the complaint is dismissed with prejudice.

[(Emphasis added).]

Judge McCarthy entered a conforming order on March 16, 2022.

Months later, plaintiff moved to voluntarily dismiss the third count of her complaint, over the objection of DBI PM and DBI. The judge granted this request in an order dated July 27, 2022, rendering this matter ripe for appeal.

II.

On appeal, plaintiff first argues Judge McCarthy erred in finding "the time provisions in Rule 4:69-6(a) precluded [her] from challenging the 2020 variance." Second, she contends the judge erred in concluding the Board's 2020 resolution was not arbitrary, capricious, or unreasonable. Third, plaintiff argues the judge mistakenly found the MLUL "did not require the notice of [Dearborn's] application to include the spray booth, because the spray booth is an integral

part of the nature of the use and a lay[person] would not know the nature of the application without knowing about the spray booth."

Importantly, plaintiff emphasizes in her reply brief that she "challenges only the holding of the trial court on [c]ount [two of her complaint] . . . as it relates to the 2020 Zoning Board decision." Lest there be any doubt about the nature of her arguments, she clarifies the dismissal of "[c]ount [one] and [c]ount [three] are not challenged." Thus, we confine our discussion to whether Judge McCarthy properly dismissed the second count of plaintiff's complaint under the March 16, 2022 order.

In that regard, we note plaintiff argues, as she did before Judge McCarthy, that "the 2020 [Resolution] expressly incorporated and relied upon the 2019 record as a finding of fact in its resolution, which opened the door to analysis of the 2019 record." She also contends the Board "arbitrarily, capriciously and unreasonably relied on the 2019 record for the false finding . . . the spray booth [was] previously approved." Moreover, she argues Dearborn was required to give notice of his intent to use a spray booth when he applied for the second use variance, because it is an "integral part of the use" of the Property, and an ordinary layperson "would not know the nature of the application without knowing about the spray booth." These arguments fail.

24

III.

We begin with a review of the principles that guide our analysis. "The MLUL is 'a comprehensive statute that allows municipalities to adopt ordinances to regulate land development in a manner which will promote the public health, safety, morals and general welfare using uniform and efficient procedures.'" Dunbar Homes, Inc. v. Zoning Bd. of Adjustment of Twp. of Franklin, 233 N.J. 546, 560 (2018) (quoting Rumson Ests., Inc. v. Mayor and Council of Fair Haven, 177 N.J. 338, 349 (2003)). Under the MLUL, the relevant municipal agency must hold a hearing on each application for development. N.J.S.A. 40:55D-10(a). As Judge McCarthy aptly observed, notice of the hearing must "state the date, time and place of the hearing, the nature of the matters to be considered and, . . . an identification of the property proposed for development." N.J.S.A. 40:55D-11.

Proper notice is a jurisdictional prerequisite. Therefore, a failure to provide adequate notice may be deemed fatal to a planning board's approval. Perlmart of Lacey, Inc. v. Lacey Twp. Plan. Bd., 295 N.J. Super. 234, 236-38 (App. Div. 1996). The purpose of providing notice

> is to ensure that members of the general public who may be affected by the nature and character of the

proposed development are fairly apprised thereof so that they may make an informed determination as to whether they should participate in the hearing or, at the least, look more closely at the plans and other documents on file.

[Id. at 237-38.]

See also Pond Run Watershed Ass'n v. Twp. of Hamilton Zoning Bd. of Adjustment, 397 N.J. Super. 335, 351 (App. Div. 2008). Therefore, the notice must "accurately identify[] the type of use or activity proposed by the [land use] applicant in lay[person]'s terms, rather than the technical zoning term for that use." Pond Run Watershed Ass'n, 397 N.J. Super.at 352 (second alteration in original) (quoting Perlmart, 295 N.J. Super. at 239). However, because "[n]either the MLUL nor Perlmart requires the notice to be exhaustive," certain "non-disclosures . . . [in a notice] that do not involve a description of what the property would actually be used for" will not render the notice deficient. Id. at 355.

"Our standard of review for the grant or denial of a variance is the same as that applied by the Law Division." Advance at Branchburg II, LLC v. Twp. of Branchburg Bd. of Adjustment, 433 N.J. Super. 247, 252 (App. Div. 2013). Thus, we recognize local boards of adjustment have "peculiar knowledge of local conditions, [and] must be allowed wide latitude in their delegated

discretion." Jock v. Zoning Bd. of Adjustment of Wall, 184 N.J. 562, 597 (2005); see also Price v. Himeji, LLC, 214 N.J. 263, 284 (2013).

A local board's decision "enjoy[s] a presumption of validity, and a court may not substitute its judgment for that of the board unless there has been a clear abuse of discretion." Price, 214 N.J. at 284. "The proper scope of judicial review is not to suggest a decision that may be better than the one made by the board, but to determine whether the board could reasonably have reached its decision on the record." Jock, 184 N.J. at 597 (citing Kramer v. Bd. of Adjustment of Sea Girt, 45 N.J. 268, 296 (1965)). However, "[a] board's decision regarding a question of law, such as whether it has jurisdiction over a matter, is subject to de novo review by the courts and thus is afforded no deference." Pond Run Watershed Ass'n, 397 N.J. Super. at 350.

As Judge McCarthy recognized, "the action of a board will not be overturned unless it is found to be arbitrary and capricious or unreasonable, with the burden of proof placed on the plaintiff challenging the action." Dunbar, 233 N.J. at 558 (alteration omitted) (quoting Grabowsky v. Twp. of Montclair, 221 N.J. 536, 551 (2015)). "A board acts arbitrarily, capriciously, or unreasonably if its findings of fact in support of [its decision] are not supported by the record, . . . or if it usurps power reserved to the municipal governing body or another

27

duly authorized municipal official." Ten Stary Dom P'ship v. Mauro, 216 N.J. 16, 33 (2013) (citations omitted). "[W]hether [a board's] action was unreasonable, arbitrary or capricious must be decided upon the basis of what was before the . . . board and not on the basis of a trial de novo . . . before the Law Division." Antonelli v. Plan. Bd. of Waldwick, 79 N.J. Super. 433, 440-41 (App. Div. 1963).

Local boards of adjustment may grant use variances where the applicant proves "both the positive and negative criteria." Ten Stary, 216 N.J. at 30. "[T]he positive criteria include proof that the characteristics of the property present an opportunity to put the property more in conformity with development plans," whereas "the negative criteria include proof that the variance would not result in substantial detriment to the public good or substantially impair the purpose of the zone plan." Ibid.

It also is well settled that under Rule 4:69-6(b), "[n]o action in lieu of prerogative writs shall be commenced . . . to review a determination of a . . . board of adjustment, or a resolution by the governing body . . . of a municipality . . . after [forty-five] days from the publication of a notice" about that determination or resolution. R. 4:69-6(b)(3). The purpose of the Rule "is designed to give an essential measure of repose to actions taken against public

bodies." Tri-State Ship Repair & Dry Dock Co., 349 N.J. Super. at 423 (quoting

Wash. Twp. Zoning Bd. of Adjustment, 217 N.J. Super. at 225).

Further, it is well established that N.J.S.A. 40:55D-70(a) empowers a

zoning board of adjustment "to . . . [h]ear and decide appeals where it is alleged

by the appellant that there is error in any . . . decision or refusal made

by an administrative officer based on or made in the enforcement of the zoning

ordinance."

> Appeals to the board of adjustment may be taken by any interested party affected by any decision of an administrative officer of the municipality based on or made in the enforcement of the zoning ordinance or official map. Such appeal shall be taken within [twenty] days by filing a notice of appeal with the officer from whom the appeal is taken specifying the grounds of such appeal.[4]
>
> [N.J.S.A. 40:55D-72(a) (emphasis added).]

"An interested party clearly includes a neighbor who is affected 'by the grant of

a . . . permit that . . . violates the zoning ordinance.'" Harz, 234 N.J. at 322

---

[4] "'An appeal to the board of adjustment shall stay all proceedings in furtherance of the action in respect to which the decision appealed from was made unless' the administrative officer certifies that a stay would 'cause imminent peril to life or property.'" Harz v. Borough of Spring Lake, 234 N.J. 317, 322-23 (2018) (alteration omitted) (quoting N.J.S.A. 40:55D-75).

(quoting Cox et al., New Jersey Zoning & Land Use Administration § 26-1.1, at 559 (2018)).

The twenty-day timeframe to appeal to a board under N.J.S.A. 40:55D-72(a) "was intended to provide a degree of assurance that the recipient [of a permit] could rely on the decision of the administrative officer" and "designed to insulate the recipient of a . . . permit . . . from the threat of unrestrained future challenge." Sitkowski v. Zoning Bd. of Adjustment of Lavallette, 238 N.J. Super. 255, 260 (App. Div. 1990). Understandably, "because no provision requires the administrative officer to notify a nearby property owner about the issuance of a zoning permit, the property owner may not know of the official action until well beyond the twenty-day limitations period." Harz, 234 N.J. at 322 (citation omitted). "In that circumstance, courts have taken the sensible position that 'the time for appeal begins to run from the date an interested person knew or should have known of the permit's issuance.'" Ibid. (quoting Trenkemp v. Twp. of Burlington, 170 N.J. Super. 251, 268 (Law Div. 1979)).

Governed by these standards, and mindful that plaintiff does not challenge Judge McCarthy's dismissal of the first count of her complaint, whereby she sought to invalidate the 2019 Resolution for lack of notice and Dearborn's "misrepresentation . . . of the intended use and lack of . . . proofs for a use

variance," we have no reason to disturb Judge McCarthy's March 16, 2022 order. We reach this conclusion, in part, because, while we agree with plaintiff that "there was never any mention of the spray booth or exhaust stack in the 2019 record," this does not change the fact she failed to exercise her right under N.J.S.A. 40:55D-72(a) to timely appeal from the grant of the August 2019 zoning permit, which allowed Dearborn to operate the spray booth and exhaust system.

The record reflects plaintiff was aware Dearborn was operating this equipment soon after he installed it, as evidenced by her testimony during the May 20, and July 8, 2020 public hearings when she referred to the "horrific" fumes generated by these units. Yet, during those hearings, plaintiff expressed no specific objection to Dearborn's proposal to expand his office space and create a showroom for potential clients. Therefore, we agree with Judge McCarthy's finding that "the issue of the spray booth was interjected into the hearing by . . . [p]laintiff" even though she was "aware of [the odor issue] for several months" and complained "to various officials associated with the Township of Wall."

Additionally, we concur with the judge's determination that plaintiff's remarks about "the already-installed spray booth did not deprive the Board of

jurisdiction to address the matters that were properly noticed and before the Board[, meaning] . . . the increase in second floor office space and site plan issues." Further, we are persuaded he properly found "there was no reason to include the spray booth in the notice under the [MLUL] because it was not part of the 2020 application."

Accordingly, because: (1) plaintiff failed to file her action in lieu of prerogative writs within forty-five days of the adoption of the 2019 Resolution; (2) she does not appeal from the dismissal of count one of her complaint as time barred; (3) she never appealed to the Board to challenge the August 2019 permit authorizing Dearborn's operation of the spray booth and exhaust system; and; (4) plaintiff does not dispute that, after Dearborn received approval for the first use variance and the August 2019 permit, he spent over $500,000 in improvements and upgrades to the Property, we are convinced Judge McCarthy properly dismissed count two of her complaint and upheld the Board's 2020 Resolution.

Finally, we need only briefly address plaintiff's contention that it was error to dismiss the second count of the complaint, considering the 2020 Resolution stated "[t]he Board is aware that the spray booth was a part of the operation that was previously approved by this Board." Plaintiff urges us to interpret this

statement as proof the Board mistakenly found it approved the spray booth in its 2019 Resolution. We are not persuaded. In fact, plaintiff's interpretation of this statement is belied by the record of the proceedings leading to the adoption of the 2020 Resolution.

As discussed, during the May 2020 public hearing, after plaintiff voiced her concerns about the spray booth and exhaust system, multiple Board members stated they had no recollection of anyone mentioning a spray booth at the March 6, 2019 hearing. The Board then adjourned the hearing to give Dearborn time to address the odor problems. After the Board reconvened in July 2020, it elicited additional testimony from Dearborn about his efforts to resolve the odor problem. Further, the Code Enforcement Officer told the Board that if it approved the second use variance application, it "might want to put a condition [in the Resolution] that if there [was] a continued problem[,] . . . [Dearborn] should come back before the Board to resolve th[e odor] issue." The Board appears to have heeded this suggestion because the 2020 Resolution expressly conditioned approval of the second use variance on Dearborn abiding by Wall Township's odor ordinance. Thus, the Board ensured plaintiff had a remedy to address any ongoing odor issues, while it also recognized these issues did not preclude it from approving the second use variance on its merits.

Accordingly, we are satisfied the Board's 2020 Resolution statement that "the spray booth was part of the operation . . . previously approved by this Board," when considered in the context of the full record of this matter, merely conveys the Board's awareness that: (1) it approved Dearborn's woodworking operation in 2019; (2) the spray booth and exhaust system were now part of that operation; and (3) any further odor issues caused by this equipment could be managed with the imposition of the conditions outlined in the balance of the Board's 2020 Resolution.

In sum, we affirm the March 16, 2022 order, substantially for the reasons expressed by Judge McCarthy in his comprehensive opinion. But we also affirm on separate grounds[5] because we are convinced that allowing plaintiff to challenge the administrative official's issuance of the August 2019 permit for the spray booth and exhaust system—without her ever having appealed from the permit decision and, instead, seeking relief through an action in lieu of prerogative writs—would improperly nullify the time constraint provided under N.J.S.A. 40:55D-72(a). Further, we recognize that if we overlooked the time restrictions outlined under N.J.S.A. 40:55D-72(a), thereby circumventing the

_____

[5] See State v. Heisler, 422 N.J. Super. 399, 416 (App. Div. 2011) (noting a reviewing court is free to affirm "on grounds different from those relied upon by the trial court").

A-3944-21

statute's purpose to promote the important policy of repose and prevent parties from resting on their rights, Dearborn would be left without a remedy, despite having expended over $500,000 in reliance on the 2019 Resolution and permit.

To the extent we have not specifically addressed any of plaintiff's remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3944-21