**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3984-21

PAUL G. BRENNAN, ESTHER
KOAI, RONALD PUORRO, and
KATHRYN PUORRO,

      Plaintiffs-Appellants,

v.

BAY HEAD PLANNING BOARD,
KAITLYN TOOKER BURKE, and
DONALD F. BURKE, JR.,

      Defendants-Respondents.

_____

Argued March 11, 2024 – Decided May 1, 2024

Before Judges Gilson, DeAlmeida, and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-0340-21.

Michele R. Donato argued the cause for appellants (Michele R. Donato and Jeff Edward Thakker, attorneys; Jeff Edward Thakker, of counsel; Michele R. Donato, on the briefs).

Barry Avram Stieber argued the cause for respondent Bay Head Planning Board (Citta, Holzapfel &

Zabarsky, attorneys; Barry Avram Stieber, on the brief).

Donald Francis Burke argued the cause for respondents Kaitlyn Tooker Burke and Donald F. Burke, Jr. (Law Office of Donald F. Burke, attorneys; Donald Francis Burke, on the brief).

PER CURIAM

Plaintiffs, Paul Brennan (Brennan) and Esther Koai (Koai),[1] challenge the grant of variances by defendant Bay Head Planning Board (BHPB) to defendants Donald and Kaitlyn Burke (the Burkes) for the construction of a single-family house on a lot neighboring their homes. The Burkes' property, designated as Block 3, Lot 13 on the Borough of Bay Head's tax map (Lot 13), lacks sufficient frontage, and the street on which it fronts is insufficiently improved. The BHPB awarded relief from these bulk requirements. Plaintiffs filed an action in lieu of prerogative writs seeking to invalidate the BHPB's decision.

On appeal, plaintiffs raise jurisdictional arguments concerning the BHPB's action, arguing: (1) the Burkes did not provide adequate notice of their variance application; (2) the BHPB was divested of jurisdiction to continue considering the application after the Burkes filed a lawsuit seeking default

---

[1] Plaintiffs Ronald Puorro and Kathryn Puorro did not join in the appeal.

A-3984-21

approval; and (3) Lot 13 merged with other nearby lots formerly in common ownership and should not have been sold without subdivision approval.

Plaintiffs also challenge the merits of the variances with a variety of arguments, primarily arguing: (1) the BHPB failed to address conditions found in a 2005 subdivision resolution concerning other lots in the same commonly owned group; and (2) relief pursuant to N.J.S.A. 40:55D-70(c)(1) and -36 was unavailable because the Burkes created their own hardships.

Additionally, plaintiffs challenge the dismissal of two counts in their complaint alleging the Burkes exerted undue influence over the BHPB. They also contend the trial court erred by denying their motion to consolidate their litigation with the Burkes' default approval matter.

Finally, plaintiffs assert the court violated their First Amendment rights related to meeting minutes they inadvertently received as part of a request to the Bay Head Borough Council (Council) pursuant to the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13. Plaintiffs argue the trial court erred by ordering no further dissemination of the minutes.

For the reasons that follow, we find no error in the trial court's orders and affirm all of them.

I.

We glean the following facts from the record. Lot 13 lies within the "R-100 Zone" for residential use on Bay Head's zoning map. Lot 13 conformed to lot size requirements set forth in Bay Head's zoning ordinance, being 47,700 square feet where 10,000 square feet are required.

Prior to 1991, Lot 13 had 300 feet of frontage on Twilight Road to its south, and over 100 feet of frontage on Warren Place to the west. Thus, it conformed to the local zoning ordinance requiring 100 feet of frontage. On May 7, 1991, Bay Head adopted Ordinance 1991-5, which vacated a large section of Twilight Road, including the entire border with Lot 13 and fifty feet of Warren Place. The ordinance stated the other 79.2 feet of Warren Place would remain, to "provid[e] egress-ingress to Lots 32 [and] 33 in Block 2, Lots 1 and 13 in Block 3, and Lot 1 in Block 4." As a result, Ordinance 1991-5 left Lot 13 in a nonconforming condition, lacking the requisite frontage.

Additionally, Warren Place is not an "improved street," which is required for a building permit pursuant to N.J.S.A. 40:55D-35. It has a paved section ten feet wide with the rest of its fifty-foot width being vegetated; those conditions do not conform to local Code § 147-2, which requires a roadway be at least

4

forty-feet wide to be considered a "street." Nonetheless, a single-family home was built on Block 2, Lot 33, which fronts on Warren Place across from Lot 13.

Until his death in 2003, Clarence Voorhees owned Block 3, Lots 1, 2, 4, 5, 6, 7, 12, and 13 on the Bay Head tax map (the Voorhees lots). Despite the common ownership, all the lots continued to be separately platted on the tax map.

In 2005, Clarence's executor applied to the BHPB for minor subdivision approval to divide Lots 2 and 4, which were each seventy-five feet wide, into three fifty-foot-wide lots. The new Lots 2.01, 3.01, and 4.01 front Osborne Avenue, with their backyards abutting Lot 13. Pursuant to Bay Head Code § 147-44(a)(5)(q), this subdivision application needed to include sketch plats showing, among other things, "[e]xisting wooded areas within the tract or immediately adjacent thereto . . . ." As a result, trees on Lot 13 were identified on the subdivision map along with large, wooded areas encompassing most of the new proposed lots. Lot 13's dimensions were unaffected by the planned subdivision.

The BHPB adopted Resolution 2004-11 approving the subdivision. Relevant here, the resolution stated Lot 13 was owned by the Voorhees estate and described it as "a rather large lot to the rear of the subject property"

5

accessible by Warren Place, a "50-foot right-of-way" that was "only paved approximately 10 feet in width." It said an "environmental study" showed "Lots 12 and 13 contain[ed] some wetlands," but there was "no environmental concern with regard to Lots 2 and 4 which [were] the subject of the application . . . ."

Resolution 2004-11 included a condition requiring the subdivision plan to show "all wooded areas within the tract or adjacent thereto on the survey map" and directed the Voorhees estate to submit a "proposal for preserving said wooded areas prior to issuance of building permits."

Following approval of the subdivision, the executor sold several of the Voorhees lots. All these lots are in the R-50 Zone and require only fifty-feet of frontage and other size requirements, which are smaller than the size requirements to which Lot 13 is subject.

Lot 13 is also subject to a conservation easement, under which the New Jersey Department of Environmental Protection (DEP) designated a significant portion of Lot 13 as wetlands and wetlands transition areas not to be developed. The easement states the "Restricted Area" cannot be "included as part of the gross area [of Lot 13] for the purpose of density, lot coverage, or open space requirements . . . ." On December 19, 2014, the executor obtained wetlands development permits from DEP to clear 5,000 square feet in the northwest

6

corner of Lot 13 to build a single-family house. The survey plan for the proposed home stated the garage on the lot was to be removed.

The Burkes purchased Lot 13 on April 18, 2016. Thereafter, they submitted an appeal to the Ocean County Board of Taxation that resulted in Lot 13 being designated as "non buildable" and with a value of $90,000 to match its purchase price.

On November 30, 2018, the Burkes received new development permits from DEP reducing the size of the Restricted Area and relocating the area where construction is allowed to the east of the property. That change created a flag-shaped buildable area. The "pole" for a driveway fronting on Warren Place is 32.36 feet wide, and the "flag" for a house is 79.2 feet wide. The buildable area encompasses 19,989 square feet, nearly double the requirement of 10,000 square feet. The remainder of Lot 13 remains conservation-restricted.

In 2019, the Burkes applied for a zoning permit to build a single-family house and pool on the newly delineated, buildable portion of Lot 13 and refurbish the preexisting garage. Bay Head zoning officer Theodore A. Bianchi, Jr. denied the permit, finding Lot 13 had insufficient frontage.

On November 26, 2019, Donald Burke filed a development application with the BHPB, appealing Bianchi's decision pursuant to N.J.S.A. 40:55D-70(a)

7

and, alternatively, requesting a bulk variance for lot frontage in accordance with N.J.S.A. 40:55D-70(c). He published notice of the application as required by N.J.S.A. 40:55D-12.

The BHBP determined at its January 15, 2020 meeting it did not have jurisdiction to consider the appeal/application because the Burkes' public notice was deficient, failing to request relief pursuant to N.J.S.A. 40:55D-36 or identify they were appealing Bianchi's decision. On February 24, 2020, the Burkes filed a new application and requested the N.J.S.A. 40:55D-36 variance, along with the relief previously requested.

Prior to March 18, 2020, all BHPB meetings were postponed due to the COVID-19 pandemic. The Burkes filed an action in Superior Court against the BHPB, seeking default approval of their application pursuant to N.J.S.A. 40:55D-61 because the BHPB failed to approve or deny it within 120 days after it was deemed complete. However, proceedings before the BHPB on the merits of the Burkes' appeal and application continued once meetings resumed in an online format.

On June 17, 2020, the Burkes published a new public notice stating they were appealing Bianchi's decision and seeking variances for frontage, lot width, garage height, garage setback, and construction on an unimproved street. The

notice stated their application concerned "the premises located at 174 Twilight Road . . . and designated on the Bay Head Tax Map as Block 3, Lot 13." Although Twilight Road no longer existed in the vicinity of Lot 13, this address remained the address of record in tax documents at the time the notice was issued.

At a hearing on July 1, 2020, a licensed professional planner and engineer (Lindstrom) testified on behalf of the Burkes that Lot 13 had 79.2 feet of frontage on Warren Place and an additional twenty-five feet along the terminus of that street, creating a total of 104.2 "continuous and unbroken" feet of frontage and obviating the need for a variance. The BHBP disagreed and voted to deny the Burkes' appeal and affirm Bianchi's decision.

On the application for variances, the Burkes presented testimony detailing the history of Lot 13 and asserting it was subject to "hardship" under N.J.S.A. 40:55D-70(c)(1) and 40:55D-36 that was created by the Borough through Ordinance 1991-5. Lindstrom testified that the requirements of N.J.S.A. 40:55D-70(c)(2) for the frontage variance were also met because there would be no detriment to the public good by the construction of the Burkes' house. He testified the Burkes' proposed dwelling would conform to the residential use requirement in the R-100 Zone and to all setback requirements. He also said the

house was consistent with the Borough's master plan of constructing single-family homes, and it would not create any improper density of construction since the buildable portion of Lot 13 was twice the minimum size for the R-100 Zone. The house's architecture would be consistent with that of others in the neighborhood, promoting a "desirable visual environment . . . ."

Lindstrom also testified the Burkes now planned to remove the existing garage on Lot 13 and replace it with a "fully conforming accessory structure," removing the need for the garage height and garage setback variances. The Burkes submitted a revised plan prior to the BHPB's July 30, 2020 meeting, showing the smaller "accessory structure."

Lindstrom further testified, although Warren Place did not meet the forty-foot width requirement, there were several streets in Bay Head with substantial residential development that also did not meet that requirement. He stated the subdivision map for the Osborne Avenue properties adjacent to Lot 13 required "turnaround driveways," but that none of them met the requirement. He also said, although Resolution 2004-11 had directed the preservation of trees on Lots 2.01, 3.01, and 4.01 except those in the building footprint of any houses, the three lots were cleared of all but one mature tree.

Lindstrom also explained the Burkes' home would not cause flooding on neighboring properties, noting water from those properties currently drains south into the wetland area because Lot 13 is lower in elevation. He stated a local ordinance obligated the Osborne Avenue properties to have their drainage run onto the street and not onto adjoining areas like Lot 13, but the lots were never graded properly to accomplish that drainage. He also testified the building plan submitted with the Burkes' application was already approved by DEP.

Gerard J. Naylis, an expert in fire safety, testified that in the event of a fire, trucks could utilize Warren Place and pull into the proposed driveway on Lot 13 to access the house. Bay Head Fire Chief Joseph Todisco (Todisco) confirmed that testimony, stating he drove the largest fire truck in the town onto Warren Place and backed it up onto Osborne Avenue to test whether Lot 13 had suitable access. He said he had "no problem" doing so. Todisco further stated he never had difficulty maneuvering trucks on other streets in Bay Head that were less than forty-feet wide, and explained the process for fighting a fire on such a street was no different than on a wider roadway. When asked specifically about a ten-foot-wide street, he remarked the department's trucks were driven into and backed out of its ten-foot garage doors "every single day."

11

As nearby property owners and "interested parties" pursuant to N.J.S.A. 40:55D-4 and -12, plaintiffs objected to the Burkes' application for variances before the BHPB. Their counsel first argued the Burkes' public notice remained deficient because it listed Lot 13's address as "174 Twilight Avenue" when that address no longer existed. The BHPB's counsel noted the address conformed to the tax map and all neighbors within 200 feet were informed.

Regarding the application's merits, plaintiffs testified to alleged harms that would result from the Burkes' proposed construction. The BHPB heard testimony that residents were told by realtors prior to purchasing their own neighboring lots that Lot 13 was "unbuildable" and would remain wooded and vacant, and their property values might suffer from drainage issues and loss of the pleasing woodland views. The neighboring lot owners confirmed they removed all the trees, except one, from their own properties and that their lots lacked turnaround driveways.

Plaintiffs additionally argued Lot 13 "merged" with the rest of the Voorhees lots under Bay Head Code § 147-6P because it was a nonconforming lot. Plaintiffs asserted that because Lot 13 did not have the minimum frontage required after May 1991, it became part of an undivided parcel and should not have been sold to the Burkes without subdivision approval. Because of the

12

merger, they posited the lot-frontage deficiency for Lot 13 was a self-created hardship.

Plaintiffs also argued conditions in Resolution 2004-11 requiring the preservation of wooded areas and removal of the preexisting garage applied to Lot 13 because it was part of the greater group of Voorhees lots. The BHPB's engineer, however, testified there were no restrictions on Lot 13 based upon the resolution because it was not part of any larger tract. Lindstrom stated he "surveyed [Lot 13] and did some deed research, there was nothing recorded of any restriction to [the] property for tree sav[ing] or any kind of easements" for that purpose.

Plaintiffs presented the testimony of an expert engineer specializing in hydrology who prepared a report for submission to DEP dated July 2, 2020, describing potential issues with drainage on Lot 13 and neighboring lots. He testified the Burkes' proposed home would cause flooding on the Osborne Avenue neighbors' properties. He conceded, however, that DEP issued a letter rejecting his findings and opinions.

Following the close of all testimony and admission of exhibits on November 4, 2020, the BHBP approved the variances for lot frontage and to build on an unimproved street by a vote of six to three. In its Resolution 2019-

13

12, adopted December 16, 2020, the BHBP found the nonconforming frontage condition of Lot 13 was not self-created by the Burkes or their predecessors in title because the lot was conforming until Ordinance 1991-5 changed the compliance of the streets bordering it.  The BHPB further found there were no other bulk variances required for Lot 13, and that a frontage variance would "not affect adjacent residential properties."

The BHPB found the building plan was consistent with the aesthetics and architecture of the neighborhood.  It further found there was "adequate access for firefighting equipment, ambulances and other emergency vehicles" and noted there was a home across the street from Lot 13 for several years, and there was no testimony that emergency vehicles could not access that house.  It further found DEP's easement, which considerably reduced the buildable portion of Lot 13, would promote environmental preservation.

The BHPB imposed conditions upon the grant of the variances, requiring, among other things, the Burkes' building plan be updated to incorporate:  (1) the Burkes' promised demolition of the preexisting garage; (2) the widening of Warren Place to twenty feet using asphalt pavement; (3) a new drainage and stormwater plan; and (4) relocation of a generator, an air conditioning unit, and pool equipment to the side of the house not facing the Osborne Avenue lots.  The

BHPB also conditioned approval on the Burkes obtaining any necessary permits and approvals from DEP, the Ocean County Planning Board, the Ocean County Soil Conservation District, the Borough Sewer and Water Department, the New Jersey Department of Transportation, and local fire officials.

On February 9, 2021, plaintiffs filed a complaint in lieu of prerogative writs against the BHBP and the Burkes seeking the reversal of the BHBP's decision. Count One alleged the lot-frontage and unimproved street variances were granted in error. Count Two asserted the BHPB erred by not requiring compliance with Resolution 2004-11 concerning the 2005 Voorhees subdivision. Counts Three and Four argued the project failed to adequately address fire safety and DEP's drainage/stormwater requirements. Count Five alleged the Burkes exerted undue influence over BHPB members. Count Six asserted the BHPB did not comply with OPRA requests filed by Brennan. Finally, Count Seven alleged the Burkes acted "in bad faith" by threatening to request Lot 13 be re-zoned for affordable housing units if the BHPB denied their application.

The Burkes moved to dismiss plaintiffs' complaint and BHPB joined the motion. Plaintiffs submitted certifications in opposition, alleging various acts of undue influence by the Burkes, including allegations that Board member

15

Holly MacPherson told a third-party that Kaitlyn Burke asked her to influence other members to vote in favor of the application and the Burkes threatened to seek approval to build affordable housing on Lot 13.

In response to those certifications, the Burkes moved to strike portions from the record on grounds they were not based on firsthand knowledge. Plaintiffs then filed a motion to allow discovery as to the undue influence and conflict of interest claims, to consolidate their action with the Burkes' default approval matter, and to expand the record. The Burkes filed a cross-motion for a protective order precluding discovery.

By order dated August 4, 2021, the trial court denied plaintiffs' motions. It found the statements in support of the motion were based on inadmissible hearsay and were not part of the record before the BHPB. It further found additional discovery was inappropriate because plaintiffs' claims were "based upon stringing together a series of rumors, allegations, and so forth" and were insufficient to warrant vacation of the BHPB's decision "as a matter of law . . . ." The trial court stated "the purpose of discovery is not to try to construct a cause of action" but to "discover reasonable admissible information or evidence in connection with" a cause of action.

16

The trial court dismissed Counts Two through Seven for failure to state a claim pursuant to Rule 4:6-2(e), leaving only Count One -- the merits of the variances. The court stated Count Six, the alleged OPRA violations, should have been filed before the Government Records Council (GRC), while Count Four, regarding the DEP permits, should be brought before that agency. The trial court found Counts Five and Seven, concerning undue influence and conflicts of interest, were not supported by sufficient evidence.

The trial court denied plaintiffs' motion for consolidation because of continuing confidential "negotiations that [were] going on a separate track as to [the variance] conditions" in the default approval litigation and because, although both actions dealt with the same variance application, merging the two actions "may just complicate the review of this matter . . . ." The denial of the discovery motion rendered the Burkes' cross-motion for a protective order moot.

Plaintiffs then made a series of OPRA requests to the Council for copies of its executive session minutes between August 2020 and September 2021. On September 23, 2021, the Council provided electronic files containing the requested documents, some of which were redacted. Yet when Brennan used his cell phone to "copy and paste" the text of the files "from [his] e-mail inbox into the iPhone application 'Notes,'" the black redaction bars disappeared,

17

allowing him to read the minutes in their entirety. Brennan was unable to explain why this occurred, but certified he did not intentionally try to remove the redactions. He later discovered he could also remove the redactions on a desktop computer by using the "copy and paste [function] in any basic word processing program (e.g. Microsoft Word, Adobe Acrobat, Gmail)." Brennan shared information from the redacted portions of the minutes, including attorney-client privileged discussions between the Council and its Special Counsel about the Borough's affordable housing obligations and settlement negotiations in the default approval litigation, with his fellow plaintiffs and "many residents of Bay Head, through e-mail or word of mouth."

The Burkes subsequently filed a motion, joined by the BHBP, for an order to show cause seeking to restrict plaintiffs from disseminating the unredacted minutes. They also demanded plaintiffs "effectuate the return" of the information. The same day, the court issued an order temporarily restraining plaintiffs from disseminating the disputed information pending a decision on defendants' motion.

Plaintiffs filed a certification by Brennan in opposition to the motion. Paragraph 24 of the certification described the content of the minutes that had been redacted. In response, the Burkes filed a motion to delete this certification,

18

joined by the BHPB.  Plaintiffs then filed a motion to dissolve the temporary restraints and vacate the October 12 order, arguing Brennan had not violated any confidentiality requirements.

At oral argument, on November 8, 2021, the parties acknowledged the redacted information had already been widely disseminated by plaintiffs. Defendants argued the disclosure of the privileged information to Brennan was involuntary.  The court found Brennan did not "have a right to view" the privileged portions of the minutes.  It ruled the documents could be used in the litigation only in their redacted format.  The court imposed permanent restraints on dissemination of the unredacted minutes' content.  On November 19, 2021, following further discussion on the record, it entered orders restricting the use of the confidential information in the current litigation and placing the entire Brennan certification under seal.

Meanwhile, plaintiffs filed a motion to amend the complaint, seeking to add two new counts.  One raised the issue of the merger of Lot 13 with the other Voorhees lots and, again, the applicability of the 2005 subdivision conditions, this time claiming the subdivision meant any "hardship" to Lot 13 was self-created by the Burkes' predecessor in title.  The other count alleged the Burkes attempted to use the default approval litigation and threats to use Lot 13 for

affordable housing as a means to bypass the conditions set forth in Resolution 2019-12. The court denied this motion, finding the amendments were an attempt to pursue claims previously dismissed.

After a trial, the court entered an order for final judgment affirming the BHPB's decision granting the variances. The court found Resolution 2004-11 did not prevent the BHPB from granting the variances and rejected plaintiffs' argument that Lot 13 merged into a "Voorhees Tract" with other lots and should not have been sold without subdivision approval. It found the Burkes' public notice concerning the application for variances was adequate, and the BHPB was not divested of jurisdiction over the application when the Burkes filed their default approval litigation.

The court also rejected plaintiffs' arguments that relief pursuant to N.J.S.A. 40:55D-70(c)(1) was unavailable because the Burkes' asserted hardships were self-created. Specifically, it found the lack of sufficient frontage for Lot 13 was a hardship under (c)(1) caused by the Borough when Twilight Road and part of Warren Place were vacated in Ordinance 1991-5. It also stated the variances were appropriate because the proposed home would meet all bulk requirements, would not shed water onto plaintiffs' properties, and would be accessible to emergency vehicles. Finally, the court rejected plaintiffs' revived

20

argument that they should be granted further discovery. The court concluded the BHPB's Resolution 2019-12 contained sufficient support for and the reasoning behind its findings of fact, and therefore dismissed the remainder of plaintiffs' complaint.

This appeal followed.

II.

When evaluating a trial court's review of a municipal planning board's action, we look for an abuse of discretion. Cohen v. Bd. of Adjustment of Rumson, 396 N.J. Super. 608, 614-15 (App. Div. 2007). A court should not disturb a decision of a local board that is "supported by substantial evidence in the record and reflect[s] a correct application of the relevant principles of land use law." Lang v. Zoning Bd. of Adjustment of N. Caldwell, 160 N.J. 41, 58-59 (1999). Similarly, motions to consolidate, discovery orders, and evidentiary rulings are reviewed for an abuse of discretion. Moraes v. Wesler, 439 N.J. Super. 375, 378 (App. Div. 2015); State in the Int. of A.B., 219 N.J. 542, 554 (2014).

A board's decision regarding a question of law, however, is subject to de novo review. Dunbar Homes, Inc. v. Zoning Bd. of Adjustment of Franklin, 233 N.J. 546, 559 (2018). Whether the board has jurisdiction over a matter is also a

legal question. Pond Run Watershed Ass'n v. Twp. of Hamilton Zoning Bd. of Adjustment, 397 N.J. Super. 335, 350 (App. Div. 2008). Likewise, a trial court's decision on a Rule 4:6-2(e) motion is reviewed de novo, and an appellate court "owes no deference to the trial court's legal conclusions." Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C., 237 N.J. 91, 108 (2019).

III.

A. BHPB's Jurisdiction.

BHPB's jurisdiction is a threshold issue. See Northgate Condo. Ass'n v. Borough of Hillside Planning Bd., 214 N.J. 120, 137-38 (2013); Waste Mgmt., Inc. v. Admiral Ins. Co., 138 N.J. 106, 119-21 (1994). Plaintiffs argue the Burkes' public notice of their application was deficient, depriving the BHPB of jurisdiction to consider it. They assert the notice improperly stated Lot 13's address as "174 Twilight Road," when the lot no longer fronted on that street. Plaintiffs also argue the notice failed to alert the public the Burkes' construction plan would "vitiate the tree-preservation provision" in Resolution 2004-11.

To comply with the Municipal Land Use Law, N.J.S.A. 40:55D-1 to -163 (MLUL), "a notice must do more than simply recite the technical terms of a proposed development." Northgate, 214 N.J. at 139. Instead, it must "inform the public of the nature of the application in a commonsense manner such that

22

the ordinary layperson could intelligently determine whether to object or seek further information." Perlmart of Lacey, Inc. v. Lacey Twp. Plan. Bd., 295 N.J. Super. 234, 239 (App. Div. 1996). The "critical element" is "an accurate description of what the property will be used for under the application." Id. at 238.

The notice must accurately identify the location of the property that is the subject of the application. Northgate, 214 N.J. at 141. The statute "offers two alternatives, requiring use of either the street address or the lot and block numbers as shown on the current tax map." Ibid. Minor discrepancies, such as clerical errors in the listing of either the address or tax map designation, do not render a notice fatally defective when interested parties are adequately apprised of the proceedings. See Northgate, 214 N.J. at 126, 142; see also Pond Run, 397 N.J. Super. at 343-50.

Here, the alleged defect in the notice as to the identification of the application's subject property is not even a clerical error. "174 Twilight Road" remained the address of record for Lot 13 on the tax map and documents related to the Burkes' tax appeal. Importantly, N.J.S.A. 40:55D-11 requires the notice to give either the street address or the block and lot numbers, and in this instance the block and lot numbers were correctly stated. There was no evidence

A-3984-21

presented that any interested parties were confused by the notice or did not come to the BHPB's meetings because they were confused. Proper notifications were sent to all neighbors in the 200-foot range, and many members of the public attended the virtual meetings and voiced their support and objections.

As to the alleged failure to fully describe the nature and impact of the application, that the notice did not mention the 2005 Voorhees subdivision and its conditions did not render it defective. A description of the proposed use of the subject property and a sufficiently detailed outline of the variances required are all that were required. Even if the conditions set forth in Resolution 2004-11 required the Burkes to preserve trees on Lot 13, it was not necessary to include the fact that some trees would need to be cleared in the public notice. There is substantial credible evidence in the record that the public notice issued by the Burkes was sufficient pursuant to N.J.S.A. 40:55D-11 and -12.

B. Effect of Default Approval.

Plaintiffs next argue the BHPB was deprived of jurisdiction to continue considering the application on its merits after the Burkes filed their action in lieu of prerogative writs seeking default approval of their application. They rely on Orloski v. Planning Board of Ship Bottom, 226 N.J. Super. 666, 670 n.1 (Law Div. 1988), aff'd, 234 N.J. Super. 1 (App. Div. 1989), in which the trial court

stated that "once an applicant has received a decision of the [planning] board and appealed in lieu of prerogative writs, the board is divested of jurisdiction absent a remand."

The BHPB addressed the Burkes' variance application in detail over the course of several hearings where plaintiffs and other residents had a full opportunity to comment, testify, and argue its merits.  Here, the Burkes did not receive a timely decision from the BHPB, and their action in Superior Court was not an appeal from any decision.  Instead, the Burkes initiated a suit in accordance with N.J.S.A. 40:55D-61, which provides a board must grant or deny an application within 120 days of its being deemed completed, as an alternative means of relief.  Because the BHPB had not reached a conclusion on the merits of the application, under the circumstances of this matter it was not divested of jurisdiction when the default lawsuit was filed.

C. Alleged Merger of Lot 13.

Plaintiffs allege Lot 13 merged into the rest of the Voorhees lots pursuant to Bay Head Code § 147-6P.  Plaintiffs claim Lot 13 could not have been sold legally to the Burkes without subdivision approval because of the merger.  They assert, therefore, the BHPB lacked jurisdiction to consider any application for variances for Lot 13.  Code § 147-6P provides, if two or more contiguous lots

25

"are in single ownership and one or more of the lots is nonconforming in any aspect," they "shall be considered to be an undivided parcel for the purposes of" zoning and planning in the Borough. No portion of this "parcel" may be "conveyed or divided" unless subdivision is first approved.

Like statutes, the goal in interpreting municipal ordinances is the discovery and implementation of the local legislative intent. DePetro v. Twp. of Wayne Plan. Bd., 367 N.J. Super. 161, 174 (App. Div. 2004). Words in an ordinance "cannot be considered to exist in a vacuum without reference to relevant policies." Terner v. Spyco., Inc., 226 N.J. Super. 532, 539 (App. Div. 1988). Instead, a court should interpret them in a manner "consonant with the probable intent of the draftsman 'had he anticipated the situation at hand.'" Jersey City Chapter of Prop. Owner's Protective Ass'n v. City Council of Jersey City, 55 N.J. 86, 101 (1969) (quoting Dvorkin v. Dover Township, 29 N.J. 303, 315 (1959)). It is essential we focus on the ordinance's purpose. White Castle Sys. v. Plan. Bd. of Clifton, 244 N.J. Super. 688, 691 (App. Div. 1990).

We "give deference to a municipality's informed interpretation of its ordinances, while nevertheless construing the ordinance de novo." DePetro, 367 N.J. Super. at 174. This standard recognizes "the board's knowledge of local circumstances . . . ." Fallone Props., LLC v. Bethlehem Twp. Plan. Bd., 369

N.J. Super. 552, 562 (App. Div. 2004). Code § 147-6P codifies the doctrine of "merger" in land use law. "Merger" describes "the combination of two or more contiguous lots of substandard size, that are held in common ownership, in order to meet the requirements of a particular zoning regulation." Jock v. Zoning Bd. of Adjustment of Wall, 184 N.J. 562, 578 (2005). It mandates subdivision approval before individual substandard parcels are developed if contiguous parcels have been in the same ownership and, if at the time of that ownership, the greater parcel was not substandard. Ibid. Merger does not preclude the treatment of the lots as separate for other purposes, such as designation on a town map or assessment of taxes. Id. at 579. It is "simply the characterization of adjacent undersized lots in common ownership as part of a larger tract or parcel with an eye toward effectuating present day zoning laws." Ibid.

Merger does not apply to "adjoining lots, owned by the same person, 'all of which are found and certified by the administrative officer to conform to the requirements of the municipal development regulations and are shown and designated as separate lots, tracts or parcels on the tax map or atlas of the municipality.'" Id. at 582 (quoting N.J.S.A. 40:55D-7). It is also inapplicable where a party comes into possession of two "back-to-back" contiguous lots fronting different streets, even if one of them is nonconforming, because merger

A-3984-21

would create an oddly long and narrow plot. Ibid. Contiguous lots created pursuant to an approved subdivision also do not merge. Id. at 583.

We agree with the trial court: Lot 13 did not merge with the other Voorhees Lots. Lot 13 has never been "undersized," Dalton v. Ocean Twp. Zoning Bd. of Adjustment, 245 N.J. Super. 453, 460-61 (App. Div. 1991), and is not contiguous with any other "lots of substandard size," Jock, 184 N.J. at 578, except the landlocked Lot 12. Merger with Lot 12 would not bring Lot 13 into compliance with the frontage requirement, which is the only bulk nonconformity it suffers. Lots 2.01, 3.01, and 4.01 were created through subdivision approval; they did not merge with any of the other Voorhees lots and were properly severed pursuant to the local ordinance.

Construing Code § 147-6P to require merger in this instance would not serve the purpose of merger, as it would entail the formation of exceptionally long, narrow lots fronting on two different streets. There is sufficient credible evidence in the record to support the trial court's finding that Lot 13 did not merge with the other lots at the time of the subdivision.

D. Variances.

Plaintiffs also challenge the grant of variances. They argue the BHPB erred by approving the Burkes' requested variances without making any findings

in its resolution addressing the conditions allegedly placed on Lot 13 through Resolution 2004-11. They assert the subdivision of Lots 2 and 4 required the protection of all the trees on Lot 13 and the removal of the garage. Plaintiffs assert a remand is necessary for the BHPB to make the necessary factual findings regarding the effect of the subdivision conditions, as well as other issues including drainage, DEP's conservation easement, and fire truck accessibility.

These arguments are without merit. Resolution 2004-11 addressed the minor subdivision of Block 3, Lots 2 and 4, into Lots 2.01, 3.01, and 4.01. Bay Head Code § 147-44(a)(5)(q) and Resolution 2004-11 required the Voorhees estate to submit plat maps showing, among other things, wooded areas on and "immediately adjacent to" the subject lots. The estate did so and identified some wooded areas on Lot 13. Resolution 2004-11 did not limit Lot 13.

The resolution further directed the estate to submit a proposal for preserving wooded areas. This, however, was stated as a condition for (1) the grant of subdivision approval, and (2) the issuance of any building permits related to the newly created lots. The resolution did not preclude potential subsequent applications for variances for any other Voorhees lot. Indeed, seeking needed variances for a proposed development is a different process than

seeking a building permit. <u>Ten Stary Dom P'ship v. Mauro</u>, 216 N.J. 16, 37 (2013).

The Burkes' plan shows the building envelope for their driveway, house, accessory structure, and pool is in the northern part of Lot 13 and quite close to the property line with the other Osborne Avenue lots. This abides by DEP's conservation easement forbidding construction on any other part of the lot. As a result, even if the resolution condition had applied to Lot 13, clearing the vegetation closest to the lots created by the 2005 subdivision would not be prohibited. There is no need for remand to address the tree-related condition in Resolution 2004-11; that condition does not apply to Lot 13.

With regard to the garage, the text of Resolution 2004-11 does not mention that structure or its removal. Regardless of whether Resolution 2004-11 did impose a condition requiring the garage's demolition, the Burkes agreed to replace it with a new, conforming structure, and the BHPB conditioned approval of the variances on that action. As a result, no remand to the BHPB is necessary on this issue.

Plaintiffs' other concerns regarding the variances, unrelated to Resolution 2004-11, are similarly misplaced. "Site conditions, including access and drainage, are valid considerations of a board when the relief requested

A-3984-21

implicates those conditions." Ten Stary Dom, 216 N.J. at 31-32. In Ten Stary Dom our Supreme Court specifically concluded "[a] deviation from prescribed lot frontage may have no impact on any valid zoning purpose other than the stated public interest in location of all lots on a public street." Id. at 33. The BHPB was not required to consider and make findings concerning purported drainage issues when addressing the Burkes' application.

Similarly, there is no need to remand for the BHPB to make findings concerning compliance with DEP's conservation easement. Like the drainage issue, compliance with the conservation easement was irrelevant to granting the requested variances. Those compliance concerns are within the control of DEP, pursuant to the enforcement provisions of its Freshwater Wetlands Protection Act Rules, N.J.A.C. 7:7A-1.1 to -22.20. The BHPB conditioned approval upon the Burkes obtaining any necessary permits and approvals from DEP and other agencies.

Finally, as to fire truck accessibility, the BHPB specifically heard testimony and found Warren Place provided sufficient access for firefighting equipment and emergency vehicles. It noted there was no testimony those vehicles could not access the home opposite Lot 13 on Lot 33. The BHPB conditioned variance approval upon the Burkes widening the paved area of

31

Warren Place to twenty feet, which would provide an even safer right of way for emergency vehicles.

In summation, remand to the BHPB is not necessary as it, and the trial court, addressed every issue that plaintiffs raised. We conclude the BHPB's decision is supported by sufficient findings in the record.

E. Alleged self-created hardship.

Plaintiffs further argue variance relief pursuant to N.J.S.A. 40:55D-70(c)(1) was unavailable to the Burkes because the hardships caused by the lot's substandard frontage and location on an unimproved street were self-created. They contend the Voorhees estate created the hardship by "pursu[ing] a subdivision" in 2005 "that did not account for the 100 foot [sic] minimum required frontage for Lot 13." They assert once more the Voorhees lots should have undergone a subdivision before any lots were sold. Because this was not done, plaintiffs claim the Burkes cannot now receive hardship variances.

"Provisions in a zoning ordinance that control the size and shape of a lot and the size and location of buildings or other structures on a parcel of property are known as bulk or dimensional requirements." Ten Stary Dom, 216 N.J. at 28. N.J.S.A. 40:55D-70(c)(1) provides a local board has the power to grant a variance from these requirements

A-3984-21

[w]here: (a) by reason of exceptional narrowness, shallowness or shape of a specific piece of property, or (b) by reason of exceptional topographic conditions or physical features uniquely affecting a specific piece of property, or (c) by reason of an extraordinary and exceptional situation uniquely affecting a specific piece of property or the structures lawfully existing thereon, the strict application of any regulation pursuant to . . . this act would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon, the developer of such property . . . .

[(footnote omitted).]

The hardship claimed must relate to a condition of or on the property in question and the property itself must be in some way atypical. Lang, 160 N.J. at 56. Examples of exceptional conditions include the property's dimensions, topographic conditions, "or some other extraordinary or exceptional feature unique to the property." Ten Stary Dom, 216 N.J. at 29. Hardship does not include the property owner's personal hardship. Ibid.

Generally, (c)(1) variances are granted because "without such relief the property will be zoned into inutility." Davis Enters. v. Karf, 105 N.J. 476, 481 (1987). A variance may be granted where the strict enforcement of the zoning ordinance will, because of the property's unique characteristics, impede the extent to which the property can be used. Lang, 160 N.J. at 55. N.J.S.A. 40:55D-35 provides that "[n]o permit for the erection of any building or

structure shall be issued unless the lot abuts a street giving access to such proposed building or structure." The street must be "certified to be suitably improved to the satisfaction of the governing body" or suitable improvement must have been "assured by means of a performance guarantee . . . ." Ibid. N.J.S.A. 40:55D-36 provides that where enforcement of this requirement "would entail practical difficulty or unnecessary hardship," the planning board may grant a variance. The grant must be "subject to conditions that will provide adequate access for firefighting equipment, ambulances and other emergency vehicles necessary for the protection of health and safety . . . ." Ibid.

The BHPB conditioned approval of the variances in this case on the widening of the paved area of Warren Place to provide emergency access, in compliance with this requirement. Lot 13 is landlocked on all sides except for 79.2 feet of frontage on Warren Place. Ultimately, Lot 13 would be zoned into inutility if the variances were not granted. It would be a "residential" lot where a residence is forbidden to be built. See Ten Stary Dom, 216 N.J. at 35 (finding (c)(1) hardship where, without a lot frontage variance, a lot could not be "developed for residential use, the only permitted use in the zone"). The trial court properly found strict application of the requirements for lot frontage length

34                                                          A-3984-21

and frontage on an improved street would create a hardship under N.J.S.A. 40:55D-36 and -70(c)(1).

Nor was this hardship self-created. Ketcherick v. Borough of Mountain Lakes Bd. of Adjustment, 256 N.J. Super. 647, 654 (App. Div. 1992). A self-created hardship "requires an affirmative action by the landowner or a predecessor in title that brings an otherwise conforming property into non-conformity." Jock, 184 N.J. at 591. If a previously conforming lot becomes nonconforming due to a new zoning or other ordinance rather than any action by the owner, the right to variance relief passes to any successors in title regardless of whether they acquired the lot with knowledge of the nonconformity. Ketcherick, 256 N.J. Super. at 655. The record amply supports the trial court's finding that the nonconformities as to the lot's frontage and its position on an unimproved street were created by Ordinance 1991-5 and the Borough, not the Burkes or any predecessor in title. Prior to that ordinance's enactment, Lot 13 had over three times the required frontage on Twilight Road, which was presumably sufficiently improved to meet the local definition of a "street."

In addition to demonstrating a hardship that is not self-created, an applicant for a (c)(1) variance must show that the variance "can be granted

A-3984-21

without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance." N.J.S.A. 40:55D-70. To determine whether these "negative criteria," Nash v. Bd. of Adjustment of Morris Twp., 96 N.J. 97, 102 (1984) are met, the local board must look at the impact of the proposed variance on nearby properties and decide whether it will cause "substantial detriment to the public good" or will "substantially impair the intent and the purpose of the zone plan and zoning ordinance." N.J.S.A. 40:55D-70.

The "substantial" modifier is key; any variance "may have some tendency to impair residential character, utility or value," Lang, 160 N.J. at 61 (emphasis omitted), and impair the zoning plan "at least to the extent that it impinges on the zoning minima," Chirichello v. Zoning Bd. of Adjustment of Monmouth Beach, 78 N.J. 544, 557 (1979). Where there is less of a difference between the required dimensions and that of the subject lot, it is "more likely the restriction is not that vital to valid public interests." Id. at 561. The negative criteria are satisfied where proposed development will not make much impact on surrounding property owners and their lots.

There is substantial evidence in the record demonstrating the negative criteria were met here. In Ten Stary Dom, our Supreme Court found all the

36

criteria for a (c)(1) lot frontage variance were met and the variance would have "no impact on any valid zoning purpose," where the lot in question, also in Bay Head, had only 10.02 feet of frontage where fifty were required. 216 N.J. at 33. Given there is already one single-family home on Warren Place, building another should not have any additional harmful consequences relating to the road's width.

There is also no evidence of substantial detriment to the public good, because the Burkes propose building a single-family residence in an area zoned for same, the house's architecture will match the rest of the neighborhood, and the conservation easement restricts the home and accessory structures to sizes in keeping with others in the area.

The BHPB did not act arbitrarily, capriciously, or unreasonably when granting the lot frontage and unimproved street variances to the Burkes under N.J.S.A. 40:55D-70(c)(1) and -35, because their application met both the positive and negative criteria under those statutes. Moreover, because we agree with the trial court that the BHPB did not err in granting (c)(1) variance approval, there is no need to discuss relief pursuant to (c)(2).

F. Consolidation.

Plaintiffs further maintain the trial court erred by denying their motion to consolidate their case with the Burkes' default approval litigation pursuant to Rule 4:38-1. They assert the two matters involved the same facts and common questions of law, and they could not succeed in their litigation if the Burkes also succeeded in their default litigation. Pursuant to Rule 4:38-1, "[w]hen actions involving a common question of law or fact arising out of the same transaction or series of transactions are pending in the Superior Court, the court on a party's or its own motion may order the actions consolidated."

Here, although the two matters at issue concern the same "transaction" -- the Burkes' application for variances -- they involve different questions of law. The issue before the court in the Burkes' default approval litigation was whether the BHPB granted or denied their application within 120 days of its being deemed completed. N.J.S.A. 40:55D-61. In contrast, the issue in plaintiffs' action was whether the BHPB reached a proper conclusion on the merits of the application. One suit involved the BHPB's alleged failure to act; the other involved its chosen action. The former concerned questions of fact involving timing, the effect of the COVID-19 pandemic, and any "consent" by the Burkes to delays in the proceedings. The latter included a review of the BHPB's

decisions regarding application of statutory criteria and interpretation of local ordinances, and factual issues such as the history of Lot 13, the character of the neighborhood, and the validity of plaintiffs' claims that the construction would be detrimental. The issues were not intertwined. The trial court did not abuse its discretion in denying plaintiffs' motion to consolidate.

G. Undue Influence.

Plaintiffs assert the trial court erred by dismissing the count for undue influence for failure to state a claim pursuant to Rule 4:6-2(e). They contend there "was an alleged threat of affordable housing unless the Burkes received approval" for their single-family home. Plaintiffs also argue the court erred by denying their request for discovery related to these allegations. They assert they were entitled to discovery, including deposing BHPB members, to search for support for undue influence.

We apply a plenary standard of review from a trial court's decision to grant a motion to dismiss pursuant to Rule 4:6-2(e). Rezem Fam. Assocs., LP v. Borough of Millstone, 423 N.J. Super. 103, 114 (App. Div. 2011) (citing Sickles v. Cabot Corp., 379 N.J. Super. 100, 106 (App. Div. 2005)). No deference is owed to the trial court's conclusions. Ibid. Although our review is liberal, dismissal is "mandated where the factual allegations are palpably insufficient to

support a claim upon which relief can be granted," Rieder v. State, 221 N.J. Super. 547, 554 (App. Div. 1987), or if "discovery will not give rise to such a claim," Dimitrakopoulos, 237 N.J. at 107. Indeed, dismissal "may not be denied based on the possibility that discovery may establish the requisite claim; rather, the legal requisites for [the] . . . claim must be apparent from the complaint itself." Edwards v. Prudential Prop. & Cas. Co., 357 N.J. Super. 196, 202 (App. Div. 2003).

Plaintiffs' complaint alleged the Burkes unduly influenced the BHPB by threatening to change their building plan to one for affordable housing if their single-family house was not approved. In opposition to defendants' motion to dismiss, plaintiffs submitted letters and e-mails from Burke, Sr., to Bay Head Mayor William Curtis dated December 21, 2020, January 11, 2021, and May 18, 2021, requesting a meeting to "discuss use of [Lot 13] to address Bay Head's constitutionally mandated affordable housing obligation." All these messages are dated after the BHPB voted to grant the variances at issue here on November 4, 2020, and adopted its memorializing Resolution 2019-12 on December 16, 2020. Nothing in the record suggests the Burkes mentioned affordable housing

before the vote was taken.[2]  Thus, even if the allegation in the complaint on this subject is presumed true, as required on a Rule 4:6-2(e) motion, plaintiffs did not state a valid cause of action.  The trial court did not err in dismissing the count.

H. First Amendment Claim.

Plaintiffs argue the court violated their First Amendment rights by ordering them not to further disseminate the improperly unredacted Council meeting minutes.  They assert the content of the minutes was of interest to other Bay Head residents because there were discussions concerning the borough's affordable housing obligations and possible related "threats" by the Burkes.  Plaintiffs further argue the trial court erred by placing Brennan's certification describing the contents of the improperly unredacted minutes under seal.

We find no error in the trial court's prohibition on the use of the improperly unredacted minutes and Brennan's full certification in this litigation.  Again, the meetings did not occur until after the BHPB granted the variances.  There is nothing in the record suggesting any of the Burkes discussed affordable housing until after that decision was made.  Thus, the information in the minutes

---

[2]  Even the redacted meeting minutes of the Council, in which the Council discussed Burke, Sr.'s affordable housing-related communications, were from sessions in 2021, after the BHPB's vote.

was not relevant to the issues in this matter. By the same token, placing Brennan's certification under seal because it described the redacted information did not have any negative impact on plaintiffs' presentation of their case. Brennan submitted multiple certifications during the pendency of the litigation, and the court had all the other statements and arguments he wished to make that were not based on privileged material. Because prohibiting the use of the documents and placing them and Brennan's certification describing them under seal could not have impacted the result of the case, the trial court did not abuse its discretion by taking these actions.

On the dissemination the redacted minutes' contents, we note at the outset Brennan should never have had access to them. OPRA specifically exempts "any record within the attorney-client privilege" from the types of "government record[s]" that must be released by a public body upon request. N.J.S.A. 47:1A-1.1. The Open Public Meetings Act (OPMA), N.J.S.A. 10:4-1 to -21, also states the public may be excluded from portions of meetings where the government body discusses "matters falling within the attorney-client privilege, to the extent that confidentiality is required in order for the attorney to exercise [the] ethical duties [of] a lawyer." N.J.S.A. 10:4-12.

Attorney-client "privilege is fully applicable to communications between a public body and an attorney retained to represent it." In re Grand Jury Subpoenas Duces Tecum Served by Sussex Cnty., 241 N.J. Super. 18, 28 (App. Div. 1989). "[A] governmental client has the same need as a corporation for assurance that legal advice provided by its attorneys will remain confidential," and maintaining that confidentiality is "in the public interest . . . ." Paff v. Div. of Law, 412 N.J. Super. 140, 152-53 (App. Div. 2010). As a result, if an exchange is covered by the privilege, the public body may meet with its attorney in a closed session, and "[t]he minutes, part or all of which may constitute work-product, then may be appropriately suppressed or redacted." Payton v. N.J. Tpk. Auth., 148 N.J. 524, 558 (1997).

The redacted parts of the minutes consisted of discussions between the Council and its Special Counsel about pending litigation and the legal matters. They were not "public records" pursuant to OPRA, the public was appropriately excluded from those portions of the meetings under OPMA, and plaintiffs were not entitled to their disclosure.

Pursuant to OPRA, Brennan should never have had access to that material, as it was attorney-client privileged and the Council did not waive that privilege. Its disclosure of the privileged information was inadvertent and should have

43

been returned by Brennan. The prohibition against the use of an inadvertent disclosure of attorney-client privileged information produced pursuant to OPRA furthers "'an important or substantial governmental interest unrelated to the suppression of expression' and . . . 'is no greater than is necessary or essential to the protection of the particular governmental interest involved.'" Seattle Times Co. v. Rhinehart, 467 U.S. 20, 32 (1984) (brackets omitted) (quoting Procunier v. Martinez, 416 U.S. 396, 413 (1974)).

To the extent we have not addressed plaintiffs remaining arguments, we find they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3984-21